TRANSCONTINENTAL GAS PIPE-
LINE CORPORATION and Transco
Gas Supply Company, Appellants,

v.

TEXACO, INCORPORATED and Tex-
aco Exploration and Production,
Incorporated, Appellees.

No. 01–98–00488–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

June 8, 2000.

Rehearing Overruled Feb. 1, 2001.

Levon G. Hovnatanian, Houston, Timothy J. Herman, Austin, David W. Holman, Richard A. Schwartz, Houston, for Appellant.

Craig A. Haynes, William T. Hankinson, Dallas, for Appellee.

Panel consists of Justices MIRABAL, TAFT, and PRICE.*

## OPINION

FRANK C. PRICE, Justice (Assigned).

Appellees, Texaco, Incorporated and Texaco Exploration and Production, Incorporated (collectively "Texaco") sued appellants, Transcontinental Gas Pipeline Corporation and Transco Gas Supply Company (collectively "Transco") for breach of contract. The jury found for Texaco and awarded in excess of $20,000,000 (including prejudgment interest and attorneys' fees). In 10 points of error, Transco appeals the judgment. We affirm.

## BACKGROUND

In the 1970s, there was a shortage of natural gas. During this time of high demand and low supply, pipelines like Transco sought to increase its gas supplies in order to meet their customers' demands for gas. Because of the shortage, experts predicted that oil and gas prices would rise. Indeed, in 1978, Congress passed the Natural Gas Policy Act, which raised the maximum legal price that pipelines such as Transco could pay for gas.

### Oak Hill Contract

Around this time, Transco, as buyer, and Texaco, as seller, entered into 72 gas-purchase agreements covering property leased by Texaco in Texas, Louisiana, and the Gulf of Mexico. This case concerns one particular gas-purchase agreement, the Oak Hill Gas-purchase Agreement

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

("the Oak Hill contract"), executed in 1980. Under the Oak Hill contract, Texaco agreed to deliver to Transco, and Transco agreed to take or pay for, a quantity of "gas well gas" produced from the Oak Hill field equal to 80% of Texaco's delivery capacity from 1980 to 1995. Transco also agreed to reimburse Texaco for all excess royalty payments that Texaco might find itself required to pay to any of its royalty owners with respect to gas delivered to Transco under the Oak Hill contract.[1] The contract expressly restricted "excess royalty" coverage to claims for royalties on gas actually produced. Transco and Texaco continued their relationship under the Oak Hill contract and the other gas-purchase agreements until the mid–1980s, when economic and regulatory changes jarred the natural gas industry.

The Natural Gas Policy Act motivated producers to increase drilling and production. As a result of the increase, Transco found itself obligated to buy much more gas than it could resell. Texaco claims this was Transco's first breach of the Oak Hill contract. In response to the Natural Gas Policy Act, Transco devised a series of market programs designed to reduce the price Transco paid and the volumes it was obligated to take under contracts such as the Oak Hill contract. Texaco participated in two such programs, the Market Retention Program (MRP) and the Market Maintenance Program (MMP). Both the MRP and the MMP contained restrictions that expressly limited excess-royalty protection to claims for lost royalties on produced gas. For its part, Transco granted Texaco and other program participants a more favorable status than other sellers. The market programs were intended to be temporary measures, entered into with the idea that all the terms of the original gas-purchase agreements would resume when the market regained its strength.

**Omnibus**

In 1984, the Federal Energy Regulatory Commission ("FERC") issued Order 380, which effectively released many of Transco's previously captive customers from their contractual take-or-pay obligations to purchase gas from Transco and allowed it to purchase gas from other sources. Order 380 also created a large low-cost spot market[2] for natural gas. But FERC did nothing to free pipelines like Transco from its obligations to take or pay for gas from the producers or from its concomitant obligations to deliver the gas. In fact, FERC later issued Order 436, which allowed a pipeline's customers to buy gas directly from producers and, for the first time, required pipelines to transport gas for the producers even though the producers might sell the gas more cheaply than the pipelines to the pipeline's own customers.

Because of the availability of cheaper gas and the release of the customers' contractual obligations to purchase more expensive gas from Transco under the existing agreements, Transco lost the majority of its market to spot competition. This caused its gas sales to fall to all-time lows. These market conditions were a national problem; pipelines were unable to continue buying the quantities of natural gas they had contracted to buy.

Order 436 was eventually appealed, and federal courts found that FERC had erred adversely to the pipelines in passing it. The courts directed FERC to address the order's serious ramifications to the pipelines. In response, FERC issued Order 500. That order contained a cross-credit-

---

1. Such provisions were not uncommon; in a market with rising prices, gas producers requested them as protection against the claims of royalty owners who believed royalty payments should have been made based on the highest price available in the market, not the price the producer actually received under a long-term gas-purchase agreement.

2. A "spot market" is one in which cash sales are made for immediate delivery. Deluxe Black's Law Dictionary 1402 (6th ed.1990). "The spot market price of gas is much lower than the long-term contract price." *Lone Star Gas Co. v. Railroad Comm'n,* 798 S.W.2d 888, 893 (Tex.App.—Austin 1990), *rev'd on other grounds,* 844 S.W.2d 679 (Tex.1992).

ing mechanism that allowed a pipeline transporting gas for a producer that had displaced pipeline sales in its market to credit that volume of gas against the pipeline's own take-or-pay obligations to that producer. The order gave pipelines such as Transco the upper hand in renegotiating gas-purchase agreements to a level more consistent with market realities. Most gas-purchase agreements in the industry were renegotiated because of Order 500. Under these conditions, Transco and Texaco negotiated a global settlement of accrued claims under, and modifications to, all 72 gas-purchase agreements between them. First, they modified all of the agreements on an interim basis. Then, in April 1988, they incorporated their settlement of and modifications to the gas-purchase agreements into an Omnibus Contract Amendment and Settlement Agreement (the "Omnibus"). The Omnibus settled Texaco's claims under the gas-purchase agreements with regard to accrued take-or-pay obligations, minimum takes, volumes, and pricing. Transco gave Texaco lump-sum payments of $4,000,000.00 and $4,900,000.00, and other non-cash considerations.

The Omnibus also modified some of Transco and Texaco's rights and obligations, as expressed in the gas-purchase agreements. Under the agreements, as modified by the Omnibus, Transco gave Texaco an annual weighted average price for all gas quantities Texaco delivered from the various fields covered by the Omnibus, including the Oak Hill field. The agreed weighted average price was less than the contract price then in force under some of the gas-purchase agreements, including the Oak Hill contract, but generally higher than market prices.

The Omnibus lowered the quantity of gas that Transco was obligated to take from Texaco under the gas-purchase agreements. Pursuant to the Omnibus, Transco was to take or pay for 70 percent of Texaco's gas deliverability from the aggregate of all fields covered by the Omnibus, rather than the 80 percent required under the Oak Hill contract. In other words, the Omnibus reduced Transco's volume obligation to 70 percent of Texaco's total deliverability, and allowed Transco to meet that volume obligation from any of the fields covered by the 72 agreements. The Omnibus reduced the average price of all Texaco gas to $1.80 per MMBtu. At the time, the Oak Hill price was $8.80 per MMBtu. Transco estimated that the pricing and volume reductions in the Omnibus relieved them of take-or-pay obligations having a present value of $241 million. In return, Texaco sought Transco's protection against royalty owner complaints that Texaco should not have signed the Omnibus. The Omnibus also gave Texaco the right to force Transco to release, from one or more of the gas-purchase agreements, any gas that Transco did not request.

The Omnibus's Excess Royalty Payments Provision ("ERPP")[3] obligated Transco to reimburse Texaco for all "excess royalty payments" that were claimed based on the price Texaco would have received under the provisions of the applicable contracts, including the Oak Hill contract, prior to being modified. Unlike the Oak Hill contract, the MMP, and the MRP, the Omnibus did not define the term "excess royalty payments." Texaco's lead negotiator, Gerald Hahn, was unable to anticipate all of the royalty owners' complaints, and therefore requested broad excess-royalty protection. Hahn testified that without this broad excess royalty protection, Transco would not have gotten the hundreds of millions of dollars in relief from its gas contract obligations. Texaco contends the parties intentionally omitted the prior language restricting the excess royalty protection to produced volumes.

The price set in the Omnibus could be renegotiated each year, and if the parties could not reach an agreement, the Omnibus gave each party the right to terminate

---

3. Transco drafted the ERPP in the Omnibus.

any of the gas-purchase agreements, up to 50 percent of total deliverability. In accordance with this provision, Texaco terminated the Oak Hill contract, along with 61 other gas-purchase agreements, by sending Transco a termination letter on April 19, 1989. The effective date of the termination was May 19, 1989. Transco later terminated the remaining gas-purchase agreements, leaving none in force between the parties. Both parties agree that the Omnibus Settlement Agreement was never terminated.

### Royalty owners' Claims

In 1990, in cause number 90–195, *O'Neal Brightwell, et al. v. Texaco, Inc., et al.*, a group of approximately 80 royalty owners in the Oak Hill field sued Texaco and other companies operating in the Oak Hill field. One of the royalty owners' claims was that Texaco had failed to develop their lands, i.e., had failed to drill wells from which gas could be produced in the Oak Hill field. The royalty owners also claimed that Texaco failed to properly market the gas that it did produce, and that Texaco renegotiated the Oak Hill contract to allow Transco to pay a lower price for gas from the Oak Hill field. The owners claimed they would have received about $100 million more in royalties if Texaco had forced Transco to pay the prices in the Oak Hill Contract. They also claimed fraud, breach of the duty of good faith and fair dealing, attorneys' fees, punitive damages, gross negligence, and unjust enrichment, and alleged that accounting errors caused the payment of improper royalties. The damages were measured as royalties that Texaco would have paid at the old Oak Hill prices, for gas that was produced and gas that should have been produced.

*Brightwell* settled in 1992 for $20,000,000. Texaco's portion of the settlement payment was $11,428,571. After *Brightwell* settled, another group of royalty owners alleged claims identical to the

*Brightwell* claims, in cause number 92–240, *Thomas B. Armstrong, et al. v. Texaco, Inc., et al.* *Armstrong* settled for $3,800,000, of which Texaco paid $2,182,552. After *Armstrong* settled, Texaco paid another $1,127,374 to settle the claims of Oak Hill royalty owners who were not parties to either *Brightwell* or *Armstrong*.[4]

### This Suit

Texaco sued Transco, seeking to recover from Transco the sums Texaco paid to settle the Oak Hill royalty owners' claims. Texaco alleged that Transco had contracted to reimburse Texaco for payments Texaco made to settle the royalty owner claims in *Brightwell* and *Armstrong,* and the other non-litigated claims for which Texaco also paid money. Referring to the "excess royalty payments" language in the Omnibus as an indemnity provision and an indemnity obligation, Texaco claimed Transco breached this alleged promise. Texaco claimed indemnity from Transco, not only for the claims relating to produced gas, but for all of the claims made by the royalty owners that Texaco paid.

At trial, the jury heard evidence about the industry usage of the terms "excess royalty" and "excess royalty payments" from three experts presented by Texaco and two experts presented by Transco. All experts agreed the term "excess royalty payment" has a meaning in the natural gas industry. Transco's experts testified that an excess royalty payment is limited to claims for produced gas, while Texaco's experts testified that there is no industry understanding that an excess royalty clause is necessarily limited to claims for produced gas. All of the experts agreed that an excess royalty clause is used in the industry as a risk shifting device. Experts from both sides further agreed that the clause itself determines what risks were

---

4. The decision not to develop the Oak Hill field (the *Brightwell, Armstrong,* and other royalty owners' lands) was Texaco's alone.

shifted, because the parties are free to negotiate the scope of the coverage.

The jury agreed with Texaco's evidence in all respects by finding that, in signing the Omnibus, the parties intended that "excess royalty payments" would include reimbursement for the settlement of royalty owner claims on both produced and unproduced gas. The jury further found that Texaco contested the Oak Hill royalty owners' claims by all reasonable means, and settled the claims reasonably, prudently, and in good faith.

The jury awarded Texaco damages totaling almost $14.5 million.[5] The jury also awarded attorneys' fees of $3.75 million. The trial court entered a judgment favoring Texaco for the full amount of damages and attorneys' fees.

In construing a written contract, our primary concern is to ascertain the true intentions of the parties, as expressed in the written instrument. *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996).

## EXCESS ROYALTY PAYMENT

In point of error one, Transco argues the trial court erred by failing to rule that the excess royalty payment provision ("ERPP") is unambiguous and that, as a matter of law, ERPP in the Omnibus does not cover claims for unproduced gas.[6]

■ When a contract is worded such that it has a certain and definite legal meaning, it is unambiguous. *Connelly v. Paul*, 731 S.W.2d 657, 660 (Tex.App.— Houston [1st Dist.] 1987, writ ref'd n.r.e.). The mere fact that the parties disagree about its meaning does not make an otherwise straightforward contract ambiguous. *GTE Mobilnet v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 289 n. 1 (Tex.App.—Houston [1st Dist.] 1997, writ denied). Nor does an ambiguity arise just because the parties' respective interpretations of the

contract are sharply conflicting. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). Only if a contract is subject to more than one reasonable interpretation can it be ambiguous. *National Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). For an ambiguity to exist, both interpretations must be *reasonable*. *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589.

■ Whether a contract is ambiguous is a question of law. *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). If the contract is unambiguous, the court must enforce the contract as written. *Id.* If a contract is ambiguous, then interpretation of the contract presents a fact issue for the jury. *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589; *Radx Corp. v. Demy*, 658 S.W.2d 298, 301 (Tex.App.—Houston [1st Dist.] 1983, no writ). A trial court errs when it does not construe an unambiguous provision as a matter of law, and instead, submits the issue to a fact finder. *GTE Mobilnet*, 955 S.W.2d at 290. When the contract is not ambiguous on its face, extrinsic evidence may not be used to create an ambiguity. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 745 (Tex.1998).

■ We may, however, examine the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589. In determining the parties' agreement, we are to examine all parts of the contract and the circumstances surrounding the formulation of the contract. *Id.* at 591. The failure to include more express language of the parties' intent does not create an ambiguity when only one reasonable interpretation exists. *Id.*

---

5. Transco does not challenge the damage amount.

6. Both Transco and Texaco pled the contract was unambiguous, but Texaco argues the ERPP does cover claims for unproduced gas.

Only when a contract is first found to be ambiguous may the courts consider the parties' interpretations. *Sun Oil Co. (DE) v. Madeley,* 626 S.W.2d 726, 732 (Tex.1981). When the meaning of the contract is plain and unambiguous, a party's construction is immaterial. *Id.*

In the Omnibus, Texaco and Transco agreed:

> 6. *Excess Royalty Payments*
>
> Effective May 1, 1986, Transco agrees to reimburse Texaco for all "excess royalty payments" which Texaco is required to pay to any royalty owner (but not to any overriding royalty owner) which are claimed based upon the price that Texaco would have received under the provisions of the Subject Contracts [i.e. Oak Hill] prior to being modified by the terms [of the Omnibus Settlement Agreement]. In the event demand is made on Texaco for the settlement of royalty payments on the basis set forth hereinabove, Transco shall have the right to participate in the defense of any such claim against Texaco, including the right to file briefs or motions, present arguments and offer or cross-examine witnesses, make investigations and approve (which approval shall not be unreasonably withheld) any settlement of claim as Transco deems expedient.

This provision does not define "excess royalty payments." The jury found that the phrase "excess royalty payments" encompassed money Texaco paid to settle claims for produced and unproduced gas. Transco, however, argues that the definition found in the Oak Hill contract applied, because that contract was one of the "subject contracts" referred to in the Omnibus's ERPP. The definition in the Oak Hill contract is underlined in the paragraph as follows:

> 4. [Transco] agrees, subject to [Texaco] obtaining authorization from the Federal Energy Regulatory Commission, to reimburse [Texaco] for all "excess royalty payments" which

[Texaco] may be required to pay (or which [Texaco] demonstrates to the satisfaction of [Transco] that there is reasonable probability that it may be required to so pay) to any royalty owner (but not to overriding royalty interests created during the term hereof) with respect to gas delivered to [Transco] hereunder. *"Excess royalty payments" as used herein is defined as the amount by which royalty payments under [Texaco's] property ... exceed the amount such payments would have been if made at the prices received by [Texaco] under the terms of this agreement.* In the event demand is made on [Texaco] by any royalty owner for the Settlement of "royalty payments" on any amount in excess of the prices received by [Texaco] under the terms of this agreement, [Texaco] shall notify [Transco] of such demand as soon as it is practicable.

Transco contends that, because the parties specifically provided that the Oak Hill contract and the Omnibus were part of one overall contractual agreement between them, and because no other definition of the term is found, as a matter of law the definition of "excess royalty payments" in the Oak Hill contract must be the definition of "excess royalty payments" in the Omnibus.

Texaco responds that Transco's interpretation is unreasonable. The Omnibus has no language incorporating the excess-royalty definitions from any of the gas-purchase agreements into the Omnibus. The Omnibus covers 72 gas-purchase agreements with varying or no excess-royalty coverage. Texaco reasons that if the excess-royalty clause found in the Oak Hill contract adds nothing to the Omnibus, then its inclusion would be surplusage. The Omnibus excess-royalty clause therefore stands on its own.

Texaco further argues that the restriction in the Oak Hill contract, which limits

the coverage to gas *delivered*, is separate and distinct from the actual definition of "excess-royalty payments" found in the second sentence. If Transco contends the definition found in the Oak Hill contract was incorporated in the Omnibus, the inclusion would only pertain to the second sentence, which does not restrict coverage to *delivered* gas. Finally, the Omnibus expressly provides, "In the event of any conflict or inconsistency between the terms of this Agreement and the terms of any of the Subject Contracts, this Agreement shall control."

■ Texaco asserts that Transco knew how to exclude unproduced gas from excess-royalty coverage when it chose to, because the MMP, MRP, Oak Hill contract, and many other gas-purchase agreements expressly limited excess-royalty coverage to "gas delivered." According to Texaco, the broadened coverage in the Omnibus was part of the *quid pro quo* for Texaco's agreement to give Transco pricing and volume relief totaling at least a quarter of a billion dollars. Texaco contends the exclusion was intentionally left out of the Omnibus during the parties' negotiations. When parties include exclusions in prior indemnity clauses and omit them in a new clause, the court will assume the omission was purposeful and that broader coverage was intended. *Pioneer Chlor Alkali Co. v. Royal Indem. Co.*, 879 S.W.2d 920, 938 (Tex.App.—Houston [14th Dist.] 1994, no writ).

Transco next argues the use of the word "price" in the Oak Hill ERPP is significant, because Texaco would not receive a price for gas unless Texaco first produced some gas to sell. Citing the U.C.C. section 2.106(a) as authority, Transco illustrates that a sale is the passing of title from the seller to the buyer for a price. *See* TEX. BUS. & COM.CODE Ann. § 2.106(a) (Vernon 1994). As Texaco points out, the U.C.C. does not say there can be a price only if there is a sale. It stands to reason the parties could agree to a price and then never consummate the sale. This is most

likely why, under the U.C.C., a party can sue for damages based on the contract price for a sale that did not occur. TEX. BUS. & COM.CODE ANN. §§ 2.709, 2.713 (Vernon 1994).

We hold the ERPP is unambiguous, and that it covers unproduced gas as well as produced gas. The trial court thus erred by not ruling that the ERPP is unambiguous, but the error was in Transco's favor.

We overrule point of error one.

## OMNIBUS AMENDMENT

■ In point of error two, Transco contends the ERPP in the Omnibus does not cover failure-to-develop claims as a matter of law.

Transco asserts the phrase "excess-royalty payments" cannot cover a claim for lost royalties on unproduced gas, because the word "royalty" necessarily refers only to produced gas. As a matter of law, therefore, no royalty payment is due unless and until there is gas production. *Mandell v. Hamman Oil & Ref. Co.*, 822 S.W.2d 153, 165 (Tex.App.—Houston [1st Dist.] 1991, writ denied). The Oak Hill leases, like the leases in *Mandell*, tied royalty payments to production. *Id.* at 156. As a result, Transco argues any recovery that the Oak Hill royalty owners received on their failure-to-develop claims—which are complaints about a lack of production (a/k/a unproduced gas)—could not, as a matter of law, have constituted the recovery of royalty payments. Texaco contends the cases Transco relies on are actually espousing that lump-sum take-or-pay settlements are not royalty bearing. Regardless, they are easily distinguished from the facts of this case. A development claim is a claim for lost royalties for gas that *should have been* produced. By contrast, Texas take-or-pay cases hold that a lump-sum payment is not royalty-bearing, because it is a cash payment to *not* produce gas. *Alameda Corp. v. Transamerican Natural Gas Corp.*, 950 S.W.2d 93, 97 (Tex.App.—Houston [14th

Dist.] 1997, writ denied). The take-or-pay cases shed no light on whether an excess-royalty clause can cover claims for lost royalties on gas that the royalty owners say should have been produced. This is additionally true because the Omnibus covers properties in other states where take-or-pay laws are different.

Transco's legal expert, Gary Conine, testified regarding royalties and other matters in the case. He testified that the terms "excess royalty" and "royalty" are related, but do not mean the same. Conine further testified he was not aware of any law or literature stating that an excess-royalty clause is always limited to claims for produced gas.

Phrases incorporating the term "royalty" are not limited to those pertaining to produced gas. For example, a "compensatory royalty" is a royalty paid in lieu of drilling a well that would otherwise be required under the covenants of a lease. *See* Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms 181 (10th ed.1997). A "minimum royalty" is a payment made regardless of production, such payment frequently to be chargeable against future production, if any, accruing to the royalty interest. *Id.* at 627. A "shut-in royalty" is a payment made when a gas well, capable of producing in paying quantities, is shut-in for lack of a market for the gas. *Id.* at 999. A "substitute royalty" is a payment by a lessee to a lessor for the privilege of keeping a lease alive without producing from a well. *Id.* at 1048. We hold the ERPP in the Omnibus covered failure-to-develop claims.

We overrule point of error two.

### INTERPRETATION OF ERPP

In point of error three, Transco argues Texaco's proposed interpretation of the ERPP is not reasonable. Having found the contract unambiguous and having found Texaco's interpretation prevails, it is unnecessary for us to address this point of error.

We overrule point of error three.

### INDEMNITY AGREEMENT

In point of error four, Transco contends that, because the ERPP is an indemnity agreement that does not expressly cover claims for unproduced gas, Texaco's claims for damages relating to unproduced gas should fail as a matter of law.

An indemnity agreement is "[a] collateral contract or assurance, by which one person engages to secure another against an anticipated loss or to prevent him from being damnified by the legal consequences of an act or forbearance on the part of one of the parties or of some third person." *Dresser Indus. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). It is uncontested that the ERPP was an indemnity provision. "Indemnity provisions that do not state the intent of the parties within the four corners of the instrument are unenforceable as a matter of law." *Fisk Elec. Co. v. Constructors & Assocs.*, 888 S.W.2d 813, 814 (Tex.1994).

### Self-contradicting and Self-defeating

Transco contends Texaco's argument is self-contradicting and self-defeating, because, if the ERPP were clear and unambiguous, Texaco should not have asked the trial court to submit to the jury the question of whether the ERPP encompasses claims for unproduced gas. If, however, the ERPP is ambiguous, then it is susceptible to two reasonable interpretations and cannot be enforced as an indemnity agreement.

Texaco, however, states Transco should not be treated as an innocent indemnitor. Transco ordered the renegotiation of the contracts and actually drafted the portion at issue. Unlike the cases cited by Transco, Texaco was not seeking indemnification for future acts, it was seeking indemnification for past events caused or contributed to by Transco. The

express negligence rule applies only to indemnification against future acts of negligence, not past acts. *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 387 (Tex.1997).

**Express Negligence Rule**

▮▮▮▮ Transco argues that under the express negligence rule, Transco cannot owe Texaco indemnity for claims for unproduced gas. The express negligence rule is not an affirmative defense, but a rule of contract interpretation. *Fisk,* 888 S.W.2d at 814. The express negligence doctrine states that "... a party seeking indemnity from the consequences of that party's own negligence must express that intent in specific terms within the four corners of the contract." *Dresser Indus.,* 853 S.W.2d at 508. This rule has been expanded to contracts indemnifying against other risks besides the indemnitee's own negligence. *See, e.g., Houston Lighting & Power Co. v. Atchison, T. & S.F. Ry. Co.,* 890 S.W.2d 455, 458–59 (Tex. 1994) (strict statutory liability for Safety Appliance Act-based FELA claims); *Dorchester Gas Corp. v. American Petrofina, Inc.,* 710 S.W.2d 541, 543 (Tex.1986) (strict products liability).

Transco maintains the Texas Supreme Court has extended the express negligence rule for two reasons: (1) contracting with specificity prevents the injustice that may occur when an innocent party incurs tremendous cost because of another's liability; and (2) indemnification is an exception to the usual business practice, in which companies are liable for their own acts or omissions, and contracts indemnifying an indemnitee against the consequences of its own actions involve an extraordinary shifting of risks. *Houston Lighting & Power,* 890 S.W.2d at 458. Transco argues that because there is no clear, specific language to indemnify Texaco from liability resulting from its own business decisions, including Texaco's exclusive decision not to develop Oak Hill field, Texaco's interpretation of the indemnity agreement should be rejected. *See Dorchester Gas,* 710 S.W.2d at 543.

Transco asks this Court to expand the express negligence doctrine to cover *any* indemnity provision that is ambiguous, despite the obvious refusal of our sister courts to expand the doctrine.[7] The Texas Supreme Court declined to extend the express negligence doctrine to an insurance-shifting provision. *Getty Oil Co. v. Insurance Co. of N. Am.,* 845 S.W.2d 794, 806 (Tex.1992). More recently, the Texas Supreme Court held the express-negligence doctrine applies to releases that relieve a party of its own negligence, but the court expressly limited its holding. *Dresser Indust., Inc.,* 853 S.W.2d at 509. "It is important to note that our discussion ... is limited solely to those types of releases which relieve a party in advance of liability for its own negligence." *Id.* at 507. Furthermore, it is not extraordinary or unjust to shift the risk of economic damages resulting from a breach of contract, particularly when both parties are experienced contractors and familiar with industry customs regarding risk shifting. *Green Int'l, Inc.,* 951 S.W.2d at 387.

We overrule point of error four.

7. *See MAN GHH Logistics GMBH v. Emscor, Inc.,* 858 S.W.2d 41, 43 (Tex.App.—Houston [14th Dist.] 1993, no writ) (The express negligence doctrine did not apply, because the parties were not seeking to recover for their own negligence.); *Whitson v. Goodbodys, Inc.,* 773 S.W.2d 381, 382 n. 2 (Tex.App.—Dallas 1989, writ denied) (Texas courts have applied the express negligence doctrine only in situations when the indemnitee was seeking to compel the indemnitor to assume responsibility for injuries resulting to a third party as a result of the indemnitee's negligence.); *Continental Steel Co. v. H.A. Lott, Inc.,* 772 S.W.2d 513, 515 (Tex.App.—Dallas 1989, writ denied) (The *Ethyl* court addressed only liability for the indemnitee's own negligence, whether sole, joint or concurrent.); *Delta Drilling Co. v. Cruz,* 707 S.W.2d 660, 668 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) (The prior clear and unequivocal test did not apply, because there was no claim for indemnity for a party's own negligence.); *M.M. Sundt Constr. Co. v. Contractor's Equip. Co.,* 656 S.W.2d 643, 644–45 (Tex.App.—El Paso 1983, no writ) (Clear and unequivocal test did not apply, because the provision did not require indemnity for a party's own negligence.).

## UNPRODUCED GAS

In point of error five, Transco argues we should reverse and render judgment in its favor on the claims for unproduced gas, thereby eliminating $11,250,000.00 in damages.

Having already concluded that the excess royalty payments in the Omnibus include unproduced gas, we overrule point of error five.

## INCOMPETENT AND PREJUDICIAL TESTIMONY

In point of error six, Transco asserts the trial court erred in admitting incompetent and prejudicial testimony regarding trade-usage.

### Waiver

■ Texaco argues Transco waived this point because Transco also introduced evidence of trade-usage. A party on appeal may not complain of the admission of improper evidence offered by the other side, when he, himself, introduced the same evidence or evidence of a similar character. *McInnes v. Yamaha Motor Corp., U.S.A.,* 673 S.W.2d 185, 188 (Tex. 1984). In *McInnes,* the party objecting to the testimony actually introduced it or opened the door. That is not the case here. Texaco brought forth trade-usage testimony before Transco's experts testified,[8] and Transco objected to the presentation of such testimony. When a judge erroneously overrules an objection to evidence and the objecting party then presents more evidence about the same fact to rebut, minimize, or explain the erroneously admitted evidence, the objecting party does not waive the judge's error in admitting the evidence. *Sipco Serv. Marine, Inc. v. Wyatt Field Serv. Co.,* 857 S.W.2d 602, 611 (Tex.App.—Houston [1st Dist.] 1993, no writ). This sound rule is recognized in civil and criminal cases. *See Harrison v. United States,* 392 U.S. 219, 226, 88 S.Ct. 2008, 2012, 20 L.Ed.2d 1047 (1968); *Valcarcel v. State,* 765 S.W.2d 412, 417–18 (Tex.Crim.App.1989). The cases recognize reality: an erroneous ruling may force the objector to present its own evidence or risk even greater harm from having the objectionable evidence go unanswered. *Sipco Serv. Marine, Inc.,* 857 S.W.2d at 612.

### Trade-usage

■ The decision to admit or exclude evidence is committed to the discretion of the trial court, and is reviewed for abuse of that discretion. *Lyondell Petrochemical Co. v. Fluor Daniel, Inc.,* 888 S.W.2d 547, 550 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

■ A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. Tex. Bus. & Com.Code Ann. § 1.205(b) (Vernon 1994); *National Union,* 907 S.W.2d at 521 n. 6. Trade-usage evidence is admissible to explain, supplement, or qualify an agreement, but it may not be used to contradict an express term. Tex. Bus. & Com.Code Ann. §§ 1.205(c), 2.202 (Vernon 1994); *Printing Ctr. of Tex., Inc. v. Supermind Publ'g Co., Inc.,* 669 S.W.2d 779, 784 (Tex.App.—Houston [14th Dist.] 1984, no writ). Trade-usage or custom evidence is also admissible to establish the meaning of an ambiguous contract. *Fox v. Gallo,* 428 S.W.2d 127, 130 (Tex.Civ. App.—Amarillo 1968, writ ref'd n.r.e.).

■ Transco argues there are three reasons the trial court erred when it allowed evidence, over Transco's objection, of "trade-usage" regarding the phrase "excess royalty payments": (1) evidence of trade-usage was improper as a matter of law; (2) Texaco failed to establish that the term "excess royalty payment" encompassed payments related to unproduced

---

8. The first witness in the trial was Professor John Lowe, a law professor from Southern Methodist University, brought by Texaco to testify about the industry usage of the terms "excess royalty" and "excess royalty payments."

gas; and (3) Texaco did not sustain its burden to prove regularity of observance.

Having found the contract was unambiguous, we hold the trial court erred when it allowed testimony of trade-usage.

## Harmless Error

■ To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was error and that the error was calculated to cause, and probably did cause, rendition of an improper judgment. *Lyondell Petrochemical Co.,* 888 S.W.2d at 550; *see* TEX.R.APP.P. 44.1. Transco argues that the trade-usage part of Texaco's case was so significant, the error must be harmful. We have found the inclusion of the testimony was improper, because the contract was unambiguous. The inclusion of the testimony was harmless however, because the jury also decided in favor of Texaco; therefore, there was no rendition of an improper judgment.

We overrule point of error six.

## NO EVIDENCE/INSUFFICIENT EVIDENCE

In point of error seven, Transco argues there is no evidence, or factually insufficient evidence, that the ERPP in the omnibus amendment covered claims for unproduced gas.

## Standard of Review

In conducting a "no evidence" review, we consider all the evidence in the light most favorable to the prevailing party, and indulge every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). If there is any evidence of probative force, i.e., more than a mere scintilla, to support the findings, we will overrule the point. *Vannerson v. Vannerson,* 857 S.W.2d 659, 666 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

In reviewing a challenge to the factual sufficiency of the evidence, we consider, weigh, and examine all of the evidence that supports and is contrary to the finding. *Vannerson,* 857 S.W.2d at 666. We will set aside the finding only if the evidence, standing alone, is so weak, or the finding so against the great weight and preponderance of the evidence, that the finding is manifestly erroneous or unjust. *Id.* As noted above, incompetent opinion testimony is not evidence, and a finding supported only by such testimony cannot survive a no evidence challenge. *Leitch v. Hornsby,* 935 S.W.2d 114, 119 (Tex.1996).

## Ambiguity

■ Within the context of its "no evidence" challenge, and continuing its trial challenge, Transco contends the trial court erred in instructing the jurors that when determining the meaning of "excess royalty payments," they could consider "all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties. [They could] consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing."

Transco claims this was an in improper instruction, because a party may not use extrinsic evidence to try to create an ambiguity or give a contract a meaning different from the one its language clearly supports. *National Union,* 907 S.W.2d at 521. A trial court is obligated to submit proper instructions and definitions that enable the jury to render a verdict. TEX.R. CIV. P. 277. A trial court has great discretion in determining what instructions to submit to a jury. *Toennies v. Quantum Chemical Corp.,* 998 S.W.2d 374, 377 (Tex. App.—Houston [1st Dist.] 1999, n.p.h.).

The jury was entitled to examine the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Trans. Corp.,* 940 S.W.2d at 589. In determining the parties' agreement, the jury could examine all parts of the contract and the circumstances surrounding the formulation of the contract. *Id.* at 591. The UCC provides

that terms set forth in a writing intended by the parties as a final expression of their agreement may not be contradicted by evidence of any prior agreement or of a contemporaneous agreement *but may be supplemented or explained* by course of dealing or usage of trade. TEX. BUS. & COM.CODE ANN. § 2.202 (Vernon 1994). The jury instruction was proper, because the evidence supported its inclusion.

Transco reurges its objection to the introduction of trade-usage testimony. We agree that such testimony is improper, but the testimony from Gerald Hahn, Texaco's lead negotiator, and Quentin Gensler, Transco's negotiator, did not fall within "trade-usage," as such. Their testimony was elicited to allow the jury to examine the circumstances surrounding the formulation of the contract. *See Columbia Gas Trans. Corp.*, 940 S.W.2d at 591. Hahn testified that Texaco wanted "to be kept whole." Transco contends neither this statement, nor anything Hahn told their negotiator, put them on notice that Texaco intended that Transco indemnify Texaco against royalty owner claims for breach of Texaco's duty to develop the Oak Hill field. Furthermore, Transco's negotiator, Gensler, testified that, during his negotiation of the Omnibus, he "never discussed the possibility with Mr. Hahn that the excess royalty payments provision might be applied to anything other than royalty payments to a lessor," and that no one from Texaco ever asked him "to provide any excess royalty payments, indemnity, or other indemnity that would apply to anything other than a sale."

 Hahn testified he had worked for Texaco, specializing in natural gas contracts, for more than 20 years. His first dealings with Transco were in the late 1970s. He helped negotiate the Oak Hill contract, which had a duration of 15 years—from March 13, 1980 to March 13, 1995. This was a "take or pay" contract, which means Transco had to take and pay for 80% of the gas or just pay for it if it was unable to take it or sell it. In June 1982, Transco notified Texaco it was having financial troubles and needed relief, although it expected the problem to be resolved by 1985. In 1983, for 24 percent of the year, Texaco's five wells were totally shut-in,[9] and in 1985, this percentage had increased to 64 percent of the year. Transco was curtailing the gas, because it did not have any place to store the gas. In 1984, when Transco devised the market programs (MMP and MRP), which lowered the price and volume in the contracts, it sent a letter informing Texaco that it would evaluate the amount of gas it could purchase, overall, and then buy that gas from producers that voluntarily complied with the new market programs. If there was any left to buy, Transco would then buy from the others. Transco stated further that for those who agreed to the market programs, Transco expected their average takes would be about 15 percent. In other words, "if Texaco had the capability of producing 100 million cubic feet a day, we would expect to produce about 15 of the hundred." As a reminder, Transco was contractually bound to produce 80 percent. For those producers who *did not* agree, the average take would be five percent, or 75 percent below the Oak Hill contract amount. Texaco could not seek other markets for its gas that was already committed to Transco.

Hahn further explained that Texaco did not participate in Transco's first marketing program, the ISP, because Texaco was not seeing any dramatic effects. The take levels had not been reduced too drastically. The problems worsened, and Texaco participated in the rest of the marketing programs, thus reducing the price and volume for Transco. These were considered "temporary departures" or a "band-aid approach." Texaco maintained the option of opting out of the marketing program, and at the expiration of the program, the par-

---

9. Hahn described "shut-in" to mean "the valve is turned all the way to the left. It is completely shut off. There are no hydrocarbons being produced."

ties would return to the terms in the Oak Hill contract. In 1985, Transco approached Texaco for permanent relief. Transco recognized that what it thought were only temporary problems were in fact permanent. After several machinations, the Omnibus agreement was signed on April 23, 1988.

Hahn testified the Omnibus was a settlement agreement that overlaid all 72 agreements [10] and lowered Transco's overall take obligations and price obligations. The Omnibus specified that its terms would control if a conflict arose between a provision in one of the contracts and the Omnibus. The Omnibus was a permanent agreement; the parties did not have the option of going back to the terms of the Oak Hill contract, as written. The parties were "giving that contract up when [they] signed the deal." Under the original Oak Hill contract, Transco could not have gotten out of the contract until 1995, but the Omnibus allowed for an annual re-evaluation and possible termination of the 72 underlying contracts.

Transco estimated it received almost a quarter of a billion dollars in concessions from Texaco as a result of the Omnibus because Texaco committed over 300 million cubic feet of gas a day to Transco. The overall average price of the 72 contracts, before the Omnibus, was around $3.00 per MMBtu. The target price after the Omnibus was $1.80 per MMBtu. The Oak Hill contract was one of the richest contracts; therefore, the "target price" posed a more significant price reduction than it did on contracts with lower prices. The Omnibus permitted Texaco to "pull back" the volumes of gas Transco chose not to take, and sell it to individual purchasers. Under the Oak Hill contract, Texaco could not sell any of Transco's 80 percent to individual purchasers.

Hahn negotiated the excess royalty clause in the Omnibus. All of Transco's marketing programs also contained excess royalty clauses. Because this was a permanent agreement, Hahn asked for a clause that was "broader than what those others had been." He recognized the risk that "the royalty owners could look very negatively at renegotiating a lucrative agreement like the Oak Hill agreement, down in price." He told Gensler that "Texaco wanted to have an indemnification from royalty owners in the event that a royalty owner was essentially upset with Texaco for walking away from those agreements."

Considering the concessions Texaco had made, as well as the permanence of the Omnibus, Hahn wanted to make sure "that in the event we were challenged and we had to pay a sum of money to a royalty owner, that I wanted to be kept whole; very simply, not being rich, but just be kept whole on those claims." Gensler never told Hahn there would only be protection for produced gas.

A review of earlier contracts between the parties shows that excess royalty provisions did not cover payments for unproduced gas. It is important to note, however, these contracts *expressly* exclude unproduced gas—the Omnibus does not. Each of the contracts in the marketing programs uses the phrase "gas delivered" in their excess royalty payments provision. According to Hahn, those words were expressly deleted in the Omnibus. Hahn made Gensler expressly aware of his concerns through the provision and the indemnification he required. The protection in the Omnibus was for all the underlying contracts—even those that did not originally contain excess royalty payment protection.

Hahn admitted Texaco benefitted from selling its gas to Transco, because Transco was paying a higher price than Texaco could get on the spot market. Transco argued it was significant that there was a document found in Texaco's files that referenced the excess royalty payments. A notation on this document stated "same as

10. Some of the underlying contracts were in Louisiana and Oklahoma.

MMP." The ERPP in the MMP does not cover unproduced gas. Hahn responded that this document was a "work in progress," and that he could not tell which agreement between Transco and Texaco the notation referenced.

The jury's findings were supported by the evidence and were not against the great weight and preponderance of the evidence.

We overrule point of error seven.

## THE OAK HILL CONTRACT

■ In point of error eight, Transco argues the trial court erred by ruling, as a matter of law, that the ERPP covers claims for gas produced and sold after May 19, 1989, when Texaco terminated the Oak Hill contract.

It is undisputed that after May 19, 1989, Transco was no longer obligated to buy gas from Texaco under the Oak Hill contract. Transco argues that the termination discharged all rights and obligations that were wholly executory, and that a party is not entitled to any damages that accrue after termination of a contract. TEX. BUS. & COM.CODE ANN. § 2.106(c) (Vernon 1994). Once Texaco's termination of the Oak Hill contract became effective, Texaco was no longer obligated to sell any volumes of gas from the Oak Hill field to Transco and was free to sell any gas that it did produce for any price and to any purchaser it chose.

Transco further argues if the parties intended that the indemnification obligation with respect to the Oak Hill field survive termination of the Oak Hill contract, they had to expressly state this in the Omnibus. Article IV of the Omnibus, which provides for termination, expressly states the only obligation of Transco that would survive termination—"Transco shall, if requested by Texaco, intervene in support of any application for abandonment authority that Texaco may file in connection with the exercise of Texaco's right of termination under this article IV." Had the parties intended that the indemnity obligation in the ERPP survive termination, contends Transco, they could have provided for this, and were required to, moreover, under the express negligence rule.

We ·disagree. Texaco sued under the excess royalty clause found in the Omnibus, and the parties agree the Omnibus has never been terminated. The Omnibus is a freestanding agreement that has never been canceled and that survives and governs the parties' relationship after the cancellation of the gas-purchase contracts.

The purpose of the Omnibus indemnity was to cover Texaco's exposure for giving up the high prices in the Oak Hill (and other) gas-purchase contracts. Texaco permanently gave up those high prices through March 1995 (the term of the Oak Hill contract) when Texaco signed the Omnibus on April 22, 1988. On July 9, 1990, more than one year after the Oak Hill contract was terminated, the parties signed an agreement (drafted by Transco) that stated as follows:

> ... Texaco hereby releases Transco from any and all claims and causes of action attributable to the price of gas tendered under the Subject Contract prior to April 30, 1989. Notwithstanding the foregoing, such release shall not cover any claims Texaco may have or *which may arise* pursuant to Paragraph 6, of Exhibit "D" to the Omnibus Agreement entitled "Excess Royalty Payment."

(Emphasis added.) The agreement clearly covered future claims. Texaco sued Transco for indemnification for royalty owner complaints that Texaco should not have signed the Omnibus. Even after cancellation of the gas-purchase agreements, the potential exposure to claims by royalty owners was still there. The only reasonable construction is that the parties intended permanent protection against that exposure.

We overrule point of error eight.

## ATTORNEYS' FEES

█ In point of error nine, Transco argues there is no evidence, or factually insufficient evidence, to support the award of attorneys' fees.

Craig Haynes, who testified regarding attorneys' fees for Texaco, stated Texaco's lawyers were handling the case for a contingency fee of 25 percent.

█ Attorney contingency fee contracts serve two main purposes. First, they allow plaintiffs who cannot afford to pay a lawyer up-front to pay the lawyer out of any recovery. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997). Second, because they offer the potential of a greater fee than might be earned under an hourly billing method, these contracts compensate the attorney for the risk that the attorney will receive no fee whatsoever if the case is lost. *Id.* The lawyer, in effect, lends the value of his services, which is secured by a share in the client's potential recovery. *Id.* The mere fact that a party and a lawyer have agreed to a contingent fee does not mean that the fee arrangement is, in and of itself, reasonable for purposes of shifting that fee to the defendant. *Id.*

█ Factors a factfinder should consider when determining the reasonableness of a fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. (Tex. STATE BAR R. art. X, § 9); *Arthur Andersen & Co.*, 945 S.W.2d at 818. The plaintiff cannot simply ask the jury to award a percentage of the recovery as a fee; without evidence of the factors identified above, the jury has no meaningful way to determine if the fees were in fact reasonable and necessary. *Arthur Andersen & Co.*, 945 S.W.2d at 818–19. Here, the attorneys' fees question, submitted to the jury specified the eight factors. Haynes testified that Thompson & Knight had been Texaco's lawyers throughout the duration of the case, which was filed in 1994. They were to be paid 25 percent of the gross recovery. Haynes testified the fee arrangement was customary, fair, and reasonable, and might even be on the "low side." The firm has handled other matters for Texaco—some on contingency fee and others on an hourly fee basis. Through the end of September (the month before the trial), the hourly billing rate of attorneys' fees multiplied by the hours worked on this case equaled $989,807.50. Haynes testified Transco pled various defenses. Using the hourly basis, Haynes testified a reasonable fee for the total handling of the trial would be $1.15 million. Haynes was asked to comment on each of the factors. He said the only one that did not really apply was the "time limitations imposed by the client or by the circumstances." Otherwise, he felt all the other factors warranted awarding the attorneys' fees. He did not "increase" his fees based on any of the factors, but that did not mean someone might say it would be reasonable to do so. Haynes testified a contingency fee or an hourly fee would have been reasonable in this case. When the judgment Texaco was

seeking was divided by the total number of hours worked on the case, the hourly fee was $666. When asked, Haynes admitted an hourly fee of $666 was not reasonable, but a contingency fee of 25 percent was. Transco raised 19 defenses to what Texaco classified as "a simple claim." This complicated the litigation as well as the risk that Texaco would only recover a portion of its claim or nothing at all.

Based on Haynes's testimony, there was sufficient evidence for the jury to award the contingency fee to Texaco's attorneys.

We overrule point of error nine.

### REVERSE AND REMAND ATTORNEYS' FEES

In point of error 10, Transco requests that in the event we reverse and remand on any portion of the damages awarded to Texaco, we should also reverse and remand the award of attorneys' fees for a new award.

Because we have not reversed and remanded on any portion of the damages, we overrule point of error 10.

We affirm the judgment.

Justice MIRABAL dissenting.

MARGARET GARNER MIRABAL, Justice, dissenting.

We are faced with construing an unambiguous contract.

When a contract is not ambiguous on its face, extrinsic evidence may not be properly used to create an ambiguity. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 745 (Tex.1998). When a contract is unambiguous, the words used are to be given their ordinary meaning. *Admiral Ins. Co. v. Trident NGL, Inc.*, 988 S.W.2d 451, 453–54 (Tex.App.—Houston [1st Dist.] 1999, pet. denied). Further, when a contract is unambiguous, the rule of construing a contract against its drafter does not apply. *GTE Mobilnet of S. Tex. Ltd. Partnership v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 290 (Tex.App.—Houston [1st Dist.] 1997, writ denied). A trial court errs when it does not construe an unambiguous provision as a matter of law, and instead, submits the issue to a fact finder. *Id.*

In my opinion, the trial court erred in not construing the unambiguous contract as a matter of law. Further, the jury's finding in response to question one is contrary to the clear and unambiguous meaning of the contract. Accordingly, I dissent.

### Analysis

The Oak Hill contract required Transco to "take or pay for" 80% of Texaco's *produced and deliverable gas* at a price of $8.80 per MMBtu for 15 years.

The later Omnibus Settlement Agreement required Transco to "take or pay for" 70% of Texaco's produced and deliverable gas at an average price of $1.80 per MMBtu (the price being subject to renegotiation yearly). The Omnibus further provided:

> Transco agrees to reimburse Texaco for all "excess royalty payments" which Texaco is required to pay to any royalty owner ... which are claimed **based upon the price that Texaco would have received under the provisions of the [Oak Hill contract]** prior to being modified by the terms [of this Omnibus Settlement Agreement].

(Emphasis added.)

What was the "price that Texaco would have received under the provisions of the Oak Hill contract?" Clearly, under the Oak Hill contract, Texaco would have received $8.80 per MMBtu for 80% of Texaco's *produced and deliverable gas*. Clearly, under the Oak Hill contract, if Texaco did not produce gas, Transco would not be obligated to take or pay for it; if Texaco *did* produce gas in deliverable amounts, Transco was obligated to take or pay for 80% of it at a specified price.

Notwithstanding the clear terms of the contracts, the majority opinion effectively holds that the "price that Texaco would

have received under the provisions of the Oak Hill contract" encompassed a price for not only gas that *was* produced, but also for gas that "should have been produced" by Texaco, but was not. Such a construction is contrary to the ordinary meaning of the words used in the Oak Hill contract.

Transco argues that the trial court erred by failing to rule that the excess royalty payment provision is unambiguous and that, as a matter of law, it does not cover claims for unproduced gas. I agree with Transco. We should sustain Transco's issues one and two, and reverse the judgment.