Opinion issued November 6, 2003










In The
Court of Appeals
For The
First District of Texas
____________

NO. 01-02-01076-CV
____________

MICHAEL A. CREEL, ALBERT M. ZIMMEREBNER, AND ROBERT N.
JONES, Appellants

V.

HOUSTON INDUSTRIES, INC. D/B/A RELIANT ENERGY, INC., Appellee

****

HOUSTON INDUSTRIES, INC. D/B/A RELIANT ENERGY, INC.,
Appellant

V.

MICHAEL A. CREEL, ALBERT M. ZIMMEREBNER, AND ROBERT N.
JONES, Appellees




On Appeal from the 61st District Court
Harris County, Texas
Trial Court Cause No. 99-59890




O P I N I O N
          In this appeal from a final summary judgment, the central issue is whether the
trial court erred in determining as a matter of law that appellant/appellee Houston
Industries, Inc. d/b/a Reliant Energy, Inc. (“Reliant”) correctly computed the amount
of severance compensation paid to appellants/appellees Michael Creel, Albert
Zimmerebner, and Robert Jones (sometimes collectively called “the plaintiffs”) under
the severance agreements that are the subject of this dispute. The secondary issues
are whether the trial court erred in rendering summary judgment (1) in favor of
Reliant on Creel’s tort claims and (2) in favor of the plaintiffs for their attorneys’ fees
incurred in the litigation, whether or not the plaintiffs prevailed in the litigation and
subsequent appeals.
          We affirm.
Background
          1.       The Severance Agreements 
          The plaintiffs are former executives with NorAm Energy Corp. (“NorAm”) or
its subsidiaries. On or about July 16, 1996, in anticipation of a probable merger by
NorAm with Houston Industries, Inc., all three plaintiffs entered into separate, but
substantially similar, severance agreements with NorAm.
          The severance agreements provided that, if a “Change in Control” occurred at
NorAm during the “Severance Period,” and if the signatory executive was terminated,
the signatory executive would receive the severance compensation set forth in section
5 of the agreements. Additionally, if the signatory executive terminated his
employment during the Severance Period because one or more enumerated events had
occurred, the signatory executive would also receive the section 5 severance
compensation.
          Under section 5, the terminated executive was entitled to receive:
in a single lump sum, an amount equal to 2.99 times the sum of (A) Base
Pay (at the highest rate in effect for any period prior to the Termination
Date) plus (B) Incentive Pay (determined in accordance with the
standards set forth in Section 1(h)).
 
Section 1(h) of the severance agreements defined “Incentive Pay” as follows:
“Incentive Pay” means an annual amount equal to not less than the
annual bonus that would have been paid for the year in which the
Change in Control occurred if the performance goals had been achieved
at the opportunity (i.e., maximum) level, pursuant to any bonus,
incentive, profit-sharing, performance, discretionary pay or similar
agreement, policy, plan, program or arrangement (whether or not
funded) of the Company [NorAm], or any successor thereto providing
benefits at least as great as the benefits payable thereunder prior to a
Change in Control.
 
(Emphasis added.)
          The severance agreements also provided that if the signatory executive was
required to incur legal fees to enforce his rights under the agreement, NorAm (or its
successor) would be obligated to pay such legal fees. To secure such payment, the 
severance agreements required NorAm (or its successor) to fund a trust account. 
Section 8 of the severance agreements provided:
(a)     It is the intent of the Company that the Executive not be required
to incur legal fees and the related expenses associated with the
interpretation, enforcement or defense of Executive’s rights under this
Agreement by litigation or otherwise because the cost and expense
thereof would substantially detract from the benefits intended to be
extended to the Executive hereunder. Accordingly, if it should appear
to the Executive that the Company has failed to comply with any of its
obligations under this Agreement or in the event that the Company or
any other person takes or threatens to take any action to declare this
Agreement void or unenforceable, or institutes any litigation or other
action or proceeding designed to deny, or to recover from, the Executive
the benefits provided or intended to be provided to the Executive
hereunder, the Company irrevocably authorizes the Executive from time
to time to retain counsel of Executive’s choice, at the expense of the
Company as hereafter provided, to advise and represent the Executive
in connection with any such interpretation, enforcement or defense,
including without limitation the initiation or defense of any litigation or
other legal action, whether by or against the Company or any director,
officer, stockholder or other person affiliated with the Company, in any
jurisdiction. . . . Without respect to whether the Executive prevails, in
whole or in part, in connection with any of the foregoing, the Company
will pay and be solely financially responsible for any and all attorneys’
and related fees and expenses incurred by the Executive in connection
with any of the foregoing. 
 
(b)     Without limiting the obligations of the Company pursuant to
Section 8(a), in the event a Change in Control occurs, the performance
of the Company’s obligations under this Section 8 will be secured by
amounts deposited or to be deposited in trust pursuant to certain trust
agreements to which the Company will be a party . . . . Any failure by
the Company to satisfy any of its obligations under this Section 8(b) will
not limit the rights of the Executive hereunder. Subject to the foregoing,
the Executive will have the status of a general unsecured creditor of the
Company and will have no right to, or security interest in, any assets of
the Company or any Subsidiary.
 
(Emphasis added.)
          2.       Merger and Termination
          On August 6, 1997, NorAm and its subsidiaries completed a merger with
Houston Industries, which was later renamed Reliant Energy, Inc. It is undisputed
that Reliant assumed NorAm’s obligations under the severance agreements and under
the trust agreements. It is also undisputed that Creel, Zimmerebner, and Jones were
terminated and entitled to severance compensation under their respective severance
agreements.


 What is disputed is whether Reliant paid all the severance
compensation due the plaintiffs under their respective agreements.
          At the time of their respective terminations, Reliant paid a lump sum to each
plaintiff under section 5 of the severance agreements, based on its interpretation of
what was meant by “annual amount” in the definition of “Incentive Pay” under
section 1(h) of the severance agreements.


 According to Reliant, whether the
“Incentive Pay” came under NorAm’s annual incentive plan or under Reliant’s short-term incentive plan that replaced it, the “annual amount” consisted of the annual cash
bonus that was paid, and did not include the value of restricted stock or stock options
that were long-term or multi-year compensation.
          3.       Litigation
          In December 1999, Jones filed suit against Reliant seeking a declaratory
judgment interpreting the term “Incentive Pay” under his severance agreement and
asserting a cause of action for breach of contract based on the argument that Reliant
had not paid him all the severance benefits to which he was entitled and had refused
to pay his attorneys’ fees incurred in connection with his pursuit of his severance
compensation. Generally speaking, he argued that, for purposes of determining his
lump sum severance compensation, the term “Incentive Pay” included not only the
annual bonus but also the value of long-term incentive benefits that were awarded
“under any bonus, incentive, profit-sharing, performance, discretionary pay or similar
agreement, policy, plan, program or arrangement.”
          Creel and Zimmerebner intervened in the lawsuit in August and October 2001,
respectively, asserting the same breach of contract claims as Jones. Creel and
Zimmerebner later amended their petitions to include negligence claims.



 
 
          4.       Facts Underlying the Tort Claims
          The following facts appear to be undisputed: In 1989, Arkla, Inc. (a
predecessor of NorAm), created two trusts. Both trusts were governed and construed
under Missouri law, and the trustee of both was a trust company located in St. Louis,
Missouri. Trust Agreement No. 1 assured the payment of amounts under certain
employment, severance, retirement, income, income deferral, death, survivor, and/or
other agreements. Trust Agreement No. 2 was established to fund certain legal fees
and other expenses associated with lawsuits brought on behalf of the beneficiaries of
NorAm covered by Trust Agreement No. 1. Reliant used Trust Agreement No. 2 to
satisfy its obligation under section 8(b) of the severance agreements to establish a
trust. As a successor to NorAm, Reliant is a party to Trust Agreement No. 2; the
plaintiffs are trust beneficiaries.



          Trust Agreement No. 2 appears to contemplate that a person seeking payment
of legal fees under a severance agreement will first submit a claim to Reliant. If
Reliant does not pay the claim within 30 days, the claim may be submitted to the
trustee for payment. Before payment, the trustee submits the claim to review
counsel.


 There is a preliminary approval process, and Reliant receives a copy of
review counsel’s preliminary approval. However, Trust Agreement No. 2 contains
no provision allowing Reliant to prevent review counsel from approving a claim or
the trustee from paying it. Trust Agreement No. 2 requires review counsel to approve
requests for expenses unless (1) the request did not receive preliminary approval or
(2) in the sole judgment of review counsel, it appears that the underlying claim is not
eligible for reimbursement, is not meritorious, or is not being pursued in manner
consistent with the nature and magnitude of the claim.
          The decision of review counsel to pay a claim is final, and the trustee may rely
on that decision for all purposes. Reliant is obligated to indemnify and hold harmless
the trustee and review counsel against any damages, losses, claims, or expenses
incurred arising out of their performance of their duties, unless arising out of their
gross negligence or wilful misconduct.
          It appears undisputed that in July 2001, Creel submitted a request for
reimbursement of his legal fees to review counsel. Reliant opposed reimbursement
on two grounds: (1) Creel’s underlying claim was not meritorious, and (2) Creel was
not listed on Exhibit A. Review counsel denied Creel’s request on the sole ground
that he was not listed on Exhibit A.


 Approximately six months later, Reliant
determined that Creel’s name should have been added to Exhibit A and so advised
review counsel. Review counsel subsequently advised counsel for the parties that
Creel’s claim was being reconsidered. Neither the record nor the briefs reveal the
result of any such reconsideration. 
          Creel amended his petition in March 2002 to add claims for negligence and
tortious interference against Reliant. Creel argued that Reliant was negligent in
failing to include his name as a trust beneficiary and tortiously interfered with his
right to receive reimbursement from the trust for his legal fees. 
          5.       Motions for Summary Judgment
          Ultimately, the plaintiffs each filed a motion for partial summary judgment on
the attorneys’ fees issue. The parties, Reliant on the one hand and the plaintiffs on
the other, filed cross-motions for summary judgment concerning the interpretation of
“Incentive Pay.” Reliant’s motion also sought summary judgment on the negligence
and tortious interference claims.
 
          6.       Final Judgment
          On October 1, 2002, the trial court signed a final judgment, as follows:
(1)     Reliant’s motion for summary judgment against the plaintiffs on
their claims of breach of contract arising from the calculation and
payment of the plaintiffs’ severance benefits was granted (without
specifying its reasons), and it was ordered that the plaintiffs take nothing
on their breach of contract claims.
 
(2)     Jones’s motion for summary judgment and Creel and
Zimmerebner’s motion for partial summary judgment on their claims of
breach of contract arising from the calculation and payment of the
plaintiffs’ severance benefits were denied (without specifying its
reasons).
 
(3)     Reliant’s motion for summary judgment against Creel and
Zimmerebner on Creel’s claims of negligence and tortious interference
and Zimmerebner’s claims of negligence was granted (without
specifying its reasons), and it was ordered that Creel and Zimmerebner
take nothing on these claims.
 
(4)     The breach of contract, negligence, and tortious interference
claims were dismissed with prejudice.
 
(5)     Reliant’s motion for summary judgment was denied with respect
to the plaintiffs’ breach of contract claims related to payment of their
attorneys’ fees. The plaintiffs’ motions for reconsideration of the order
denying their motions for partial summary judgment regarding
attorneys’ fees were granted. Reliant was ordered to pay the attorneys’
fees of Jones, Creel, and Zimmerebner incurred in the prosecution of the
suit through the completion of any and all appeals and regardless of
whether the plaintiffs prevailed in their claims. However, Reliant would
only be so obligated to the extent that the Trust had not or would not pay
such attorneys’ fees.
 
This appeal followed.
 
Standard of Review
          We follow the usual standard of review for an order granting one party’s
motion for summary judgment and denying the other parties’ motions for summary
judgment under Tex. R. Civ. P. 166a(a), (b). See Dow Chem. Co. v. Francis, 46
S.W.3d 237, 242 (Tex. 2001) (summary judgment order not specifying grounds); FM
Properties Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000) (order
granting and denying cross-motions for summary judgment); Science Spectrum, Inc.
v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997) (standard of review and burden under
rule 166a(a), (b)). We also follow the usual standards for reviewing an order granting
a motion for summary judgment. See Flameout Design & Fabrication, Inc. v.
Pennzoil Caspian Corp., 994 S.W.2d 830, 834 (Tex. App.—Houston [1st Dist.] 1999,
no pet.).
Summary Judgment on the Interpretation of “Incentive Pay”
          The first issue the plaintiffs present for this Court’s review is whether the trial
court erred in granting Reliant’s motion for summary judgment, and in denying their
motions for summary judgment, on their breach of contract claims, thereby affirming
Reliant’s method of calculating “Incentive Pay.” 
          Here, as in the trial court, both the plaintiffs and Reliant argue that there are no
material issues of fact and that the severance agreements are unambiguous. 
Nonetheless, they sharply disagree over how to interpret the language surrounding
the term “Incentive Pay.”
          The mere fact that the parties disagree about the meaning of a contract does not
make an otherwise straightforward contract ambiguous. Transcontinental Gas
Pipeline Corp. v. Texaco, Inc., 35 S.W.3d 658, 665 (Tex. App.—Houston [1st Dist.]
2000, pet. denied). Nor does an ambiguity arise just because the parties’ respective
interpretations are sharply conflicting. Columbia Gas Transmission Corp. v. New
Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996); Transcontinental Gas Pipeline
Corp., 35 S.W.3d at 665. We accept the parties’ characterization of the severance
agreements as unambiguous, as did the trial court.


 
          Therefore, our primary concern is to ascertain the true intent of the parties as
expressed within the four corners of the severance agreements. See National Union
Fire Ins. Co., 907 S.W.2d at 520; see also White v. White, 830 S.W.2d 767, 769 (Tex.
App.—Houston [1st Dist.] 1992, writ denied) (interpretation of contract is controlled
by parties’ intentions as expressed within four corners of agreement). In interpreting
the severance agreements, we examine them in their entirety in an effort to harmonize
and give effect to all their provisions so that none will be meaningless. See MCI
Telecomm. Corp. v. Texas Utils. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999); State
Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995). If a contract term
is not defined, it will be given its plain, ordinary, and generally accepted meaning. 
DeWitt County Elec. Co-op., Inc. v. Parks, 1 S.W.3d 96, 101 (Tex. 1999).
          We quoted above the relevant portion of section 5 of the severance agreements,
which provides that a terminated executive receives in a single lump sum, an amount
equal to 2.99 times the sum of (A) Base Pay plus (B) Incentive Pay.
          According to Reliant, “Incentive Pay” encompasses only the annual bonus,
based on performance for the year under consideration, and does not encompass all
awards under a “bonus, incentive, profit-sharing, performance, discretionary pay or
similar agreement, policy, plan, program or arrangement,” such as stock options and
restricted stock. According to the plaintiffs, “Incentive Pay” means the annual bonus,
as well as the value of any long-term performance measure payments, such as stock

options and restricted stock under a “bonus, incentive, profit-sharing, performance,
discretionary pay or similar agreement, policy, plan, program or arrangement.”
          The severance agreements do not specifically reference the name of the
document that determines “the annual amount” pursuant to “any bonus, incentive . .
. plan.” In their brief, the plaintiffs state there were “numerous bonus and incentive
awards in place.” Attached to the summary judgment motions of Creel and
Zimmerebner are the following documents: (1) NorAm Energy Corp. 1994 Incentive
Equity Plan, (2) Long Term Incentive Plan Cycles VII, VIII and IX Current
Performance Data, (3) Restricted Stock Agreement Performance Cycle IX, and (4)
Cycle IX Incentive Stock Option Agreement.


 We have reviewed all of these
documents.
          According to the plaintiffs’ brief and to their motions for summary judgment,
Reliant used the “Annual Incentive Award” under the 1994 Incentive Equity Plan for
the purpose of determining their “Incentive Pay.” The 1994 Plan defined the “Annual
Incentive Award” as “the annual incentive compensation payment made pursuant to
Paragraph 9.” Paragraph 9 provided that the Compensation and Benefits Committee
of NorAm’s Board of Directors could authorize payment of annual incentive
compensation, which became payable upon achievement of specified Management
Objectives. The Management Objectives were based on a one-year Performance
Cycle. Annual incentive compensation could be paid in cash, shares of common
stock equal to the aggregate value of the incentive compensation payable, or a
combination of both, as determined by the Committee.
          The 1994 Plan also provided that the Committee, from “time to time,” could
authorize grants to participants of: 
          (1)     “Option Rights,” options to purchase shares of common stock.

          (2)     “Appreciation Rights,” a right for a participant to receive an amount
determined by the Committee at the date of grant and expressed as a percentage of the
spread at the time of exercise. Appreciation Rights could be granted in tandem with
Option Rights or separate and apart from them.

          (3)     “Restricted Stock,” grants or sales of restricted common stock to
participants.

          (4)     “Opportunity Shares,” grants of opportunity shares.

          (5)     “Performance Units,” grants of performance units.

          The plaintiffs argue that the value of the long-term components of the 1994
Plan—common stock, opportunity shares, option rights, appreciation rights, restricted
stock, and performance units—should also have been included as “Incentive Pay,”



in determining their severance compensation. However, the only award the 1994 Plan
characterized as “annual” was the “Annual Incentive Award.” The other components
were awarded from “time to time.”
          Reliant does not specifically refer to the 1994 Plan in its brief. Reliant refers
generically to “NorAm’s (or NorAm’s successor, Reliant Energy’s) annual incentive
plan.” According to the recitals in Reliant’s “Annual Incentive Compensation Plan”
(AICP), it superseded and replaced the annual incentive awards portion of NorAm’s
1994 Plan effective January 1, 1999. Reliant also refers to the “annual bonus” as the
annual cash bonus provided under NorAm’s annual incentive plan or any replacement
plan that performed the same function of providing an annual cash bonus. The AICP
does not contain the term “annual bonus,” but instead defines “award” as “an
incentive compensation award payable in cash granted to a Participant with respect
to a particular Plan Year.” Under the AICP, the Compensation Committee of the
Board of Directors has the sole and absolute authority and discretion to determine the
time and manner of the awards, but the AICP states that generally, awards are made
in cash and are made at the end of the Plan Year. In its brief, Reliant also discusses
Reliant’s long term incentive compensation plan, which included grants of stock
options and restricted stock and was based on three-year performance cycles. 
According to Reliant’s motion for summary judgment, following the close of the
merger, Reliant’s long term incentive plan replaced that of NorAm’s for the
executives, including Jones and Zimmerebner, who stayed on with Reliant.
          The plaintiffs contend that the value of the long-term incentive payments
should be included in “Incentive Pay” because the long-term incentive payments
were, in fact, made annually. They assert Reliant admitted that, regardless of the
nature of the underlying performance measure, participants received awards under
both short-term and long-term incentive plans on an annual basis. The plaintiffs rely
on the deposition testimony of Dean Woods, a former employee of NorAm and, at the
time of his deposition, the Executive Director of Compensation and Benefits for
Reliant. 
Q:      Is your position, Mr. Woods, that [Creel] was not receiving annual
payments under the LTIP or long-term incentive plan?
 
A:      May I say exactly what I believe he was receiving?
 
Q:      Absolutely.
 
A:      He was receiving, as all participants in that plan were receiving,
periodic awards or grants of stock options or performance shares under
the terms of the plan.
 
Q:      How often were these periodic awards?
 
A:      Typically, they were annual awards.
 
          However, immediately after that answer, Woods was asked if Creel received
a payment under the long-term incentive plan for the year the “Change in Control”
occurred, that is 1997, the date the merger was approved.


 Recall that “Incentive
Pay” meant an annual amount equal to not less than the annual bonus that would have
been paid for the year in which the Change in Control occurred. 
          Woods’s discussion in his deposition of the payment Creel received in 1997
under the long term incentive programs indicates that it resulted from the acceleration
of the long term incentive programs in accordance with the terms of the severance
agreements. Section 3 of the severance agreements provided as follows:
3.       Acceleration of Incentive Benefits.      On the date that the last
regulatory approval is obtained for a transaction which, if consummated,
would result in a Change in Control, (i) all outstanding stock options to
purchase stock of the Company that are then held by the Executive will
become immediately exercisable notwithstanding any provision
contained in any stock option agreement to the contrary, and (ii) all
shares of restricted stock previously issued to the Executive which have
not been forfeited by the terms of any restricted stock agreement,
together with any opportunity shares provided for in such agreement,
will be delivered immediately to the Executive free of all restrictions
(other than restrictions on transfer imposed by federal or state securities
laws) notwithstanding any provision contained in any restricted stock
agreement to the contrary.
 
It would not be reasonable to treat as an “annual amount” for purposes of “Incentive
Pay” under the severance agreement an amount that was paid annually only in the
year of the Change of Control based on an acceleration of benefits clause in the same
severance agreement.
          It appears to this Court that the only reasonable construction to be given to
“Incentive Pay” is that it consists of the “Annual Incentive Award,” defined as the
annual incentive compensation payment under the NorAm 1994 Plan or the “award”
defined as “an incentive compensation award payable in cash granted to a Participant
with respect to a particular Plan Year” under Reliant’s AICP. “Incentive Pay” does
not include the value of long term incentive awards such as stock options or restricted
stock. Accordingly, we conclude the trial court did not err in granting Reliant’s
motion for summary judgment against the plaintiffs on their claims of breach of
contract arising from the calculation and payment of the plaintiffs’ severance
compensation.
Exclusion of Summary Judgment Evidence
          In their second issue, the plaintiffs contend that the trial court erred in
excluding as summary judgment evidence the employment agreement between
Reliant and nonparty Wayne Stinnett executed on March 31, 1999. The Stinnett
agreement was attached as an exhibit to Creel’s opposition to Reliant’s motion for
summary judgment. Reliant objected to the Stinnett agreement being used to construe
the severance agreements because it was not attached to any deposition testimony as
an exhibit nor was it otherwise sworn to as a true and correct copy. In its response
to the plaintiffs’ motions for summary judgment, Reliant also objected to the use of
the Stinnett agreement in interpreting the severance agreements under the parol
evidence rule. The trial court excluded the Stinnett agreement.
          Even were we to hold that the Stinnett agreement was relevant and that it was
not required to be authenticated or self-proving, the application of the parol evidence
rule would still support the exclusion of the Stinnett agreement, entered into in 1999,
in interpreting the severance agreements (executed in 1996). See Sun Oil Co.
(Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981); Transit Enters., Inc. v.
Addicks Tire & Auto Supply, Inc., 725 S.W.2d 459, 461 (Tex. App.—Houston [1st
Dist.] 1987, no writ). Accordingly, we conclude the trial court did not err in
excluding the Stinnett agreement.
Summary Judgment on Creel’s Tort Claims
          In a separate brief, Creel contends that the trial court erred in granting Reliant’s
motion for summary judgment on his negligence claim and tortious interference claim
because Reliant neither negated an essential element of Creel’s claims nor
conclusively established an affirmative defense to Creel’s claims. Furthermore, Creel
asserts that his tort claims are not “repackaged contract claims,” see Southwestern
Bell Telephone Co. v. DeLanney, 809 S.W.2d 493 (Tex. 1991), as argued by Reliant. 
In connection with this assertion, Creel maintains that his tort claims were not based
on any alleged violation of the severance agreement, but rather on Reliant’s wrongful
conduct with respect to Creel’s relationship with Trust Agreement No. 2.
          It is well established in Texas that a plaintiff cannot take a breach of contract
claim and convert it into a tort claim. See Formosa Plastics Corp. v. Presidio Eng’rs
& Contractors, Inc., 960 S.W.2d 41, 44-45 (Tex. 1997); DeLanney, 809 S.W.2d at
494. To distinguish contract and tort causes of action, we analyze the source of the
duty and the nature of the remedy. Formosa Plastics Corp., 960 S.W.2d at 45.
          Trust Agreement No. 2 is an agreement between Reliant (as a successor in
interest grantor) and the trustee. Under the express wording of Trust Agreement No.
2, the beneficiaries of the trust created by the agreement are entitled to enforce all the
terms and provisions of the agreement, although they are not parties to the agreement 
We have carefully reviewed Trust Agreement No. 2 and conclude that Reliant as
grantor took no actions under that agreement relative to Creel that it was not entitled
to take. While Creel asserts that his claims are not based on any violations by Reliant
of the severance agreement, in fact, they are. It is through the severance agreement
that Creel is entitled to have his legal fees and expenses paid for by Reliant and to be
a beneficiary of the trust created by Trust Agreement No. 2. 
          Reliant’s duty to pay for Creel’s legal fees and expenses rests on section 8 of
the severance agreement. Based on the wording of the severance agreement, we
conclude that Reliant’s duty to pay Creel’s attorneys’ fees in connection with
enforcement or interpretation of that agreement is based on the agreement itself, that
Creel’s remedy rests in contract, and that the parties contractually contemplated, in
executing the agreement, the dispute which is the subject of this litigation. 
          Based on Formosa Plastics Corp. and DeLanney, the trial court did not err in
rendering summary judgment for Reliant on Creel’s tort claims. We overrule Creel’s
issue.
Summary Judgment on the Attorneys’ Fees and Related Expenses Issue
          In its appellant’s brief, Reliant presents the issue that the trial court erred in
concluding that section 8 of the severance agreements unambiguously obligated
Reliant to pay the plaintiffs’ attorneys’ fees and related expenses.
          Reliant argues that, based on the plain, unambiguous language of section 8 of
the severance agreements, its obligation to pay attorneys’ fees must be determined
with reference to the “benefits intended to be extended” or the “benefits provided or
intended to be provided to the Executive.” According to Reliant, because the trial
court concluded that Reliant correctly determined the amount of severance
compensation, there was no intent to provide the benefit of the additional “Incentive
Pay” sought by the plaintiffs in this litigation. Reliant also contends that this Court
should consider the circumstances surrounding the formation of the severance
agreements, as shown in the testimony of Rick Spurlock, which it claims confirms
that the purpose of the attorneys’ fees provision was not to subsidize frivolous or
unmeritorious claims. Alternatively, Reliant argues that section 8 of the severance
agreements is ambiguous and that summary judgment on the attorneys’ fees matter
was, therefore, improper.
          Reliant’s main argument rests on two small phrases and ignores the remainder
of section 8, such as: “It is the intent of the Company that the Executive not be
required to incur legal fees and the related expenses associated with the interpretation,
enforcement or defense of Executive’s rights under this Agreement by litigation or
otherwise . . . .”, and: “Without respect to whether the Executive prevails, in whole
or in part,


 in connection with any of the foregoing, the Company will pay and be
solely financially responsible for any and all attorneys’ and related fees and expenses
incurred by the Executive in connection with any of the foregoing.”
          The phrase, “benefits intended to be extended” does not qualify the Company’s
responsibility to pay the Executive’s attorneys’ and other related fees and expenses
incurred in connection with litigation interpreting the severance agreements, such as
this litigation. The phrase is contained only in the reason given for the Company’s
undertaking such a responsibility without qualification: “because the cost and
expense therefore would substantially detract from the benefits intended to be
extended to the Executive hereunder.” The second phrase, or the “benefits provided
or intended to be provided to the Executive,” appears in a part of section 8(a) that
does not apply to this litigation, which was instituted by the plaintiffs: “in the event
that the Company or any other person takes or threatens to take any action to declare
this Agreement void or unenforceable, or institutes any litigation or other action or
proceeding designed to deny, or to recover from, the Executive the benefits provided
or intended to be provided to the Executive hereunder . . . .”
          Finally, the language of section 8(a) gave the plaintiffs discretion to commence
this litigation and seek payment of their attorneys’ fees from Reliant without limit or
qualification: “Accordingly, if it should appear to the Executive that the Company has
failed to comply with any of its obligations under this Agreement . . . .” Accordingly,
we conclude that the trial court did not err in granting the plaintiffs’ motion for partial
summary judgment on the issue of attorneys’ fees.
Conclusion
          The judgment is affirmed.


                                                                                            Adele Hedges
                                                                                            Justice
 
Panel consists of Justices Hedges, Nuchia, and Hanks.