In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00162-CR


______________________________




JAMES CLYDE LACKEY, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the Fourth Judicial District Court


 Rusk County, Texas


Trial Court No. CR07-301




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 After a bizarre, extended confrontation initiated and fueled by Kasey Lackey, the wife of
James Clyde Lackey (Lackey), Lackey was seen apparently tossing something onto a road. Shortly
thereafter, numerous tires were punctured by a number of roofing nails in the roadway. Lackey
appeals from a jury conviction (1) for criminal mischief with damages in excess of $1,500.00. 

 Lackey contends that the evidence is legally and factually insufficient to support both his
identification as the perpetrator of the offense and the amount of damages; Lackey also complains
that the State failed to preserve evidence and to fully investigate the case, resulting in a denial of
Lackey's  right  to  a  fair  trial.  We  affirm  the  judgment  of  the  trial  court  based  on  four
holdings: (1) legally and factually sufficient evidence supports the identification of Lackey as the
perpetrator of the offense, (2) legally and factually sufficient evidence supports a finding that
damages from the offense exceeded $1,500.00, (3) there has been no showing that any failure to
preserve evidence harmed Lackey, and (4) there has been no showing that the State failed to
adequately investigate the offense.

(1) Legally and Factually Sufficient Evidence Supports the Identification of Lackey as the
Perpetrator of the Offense


 In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d 1, 7 (Tex.
Crim. App. 2000).

 In a factual sufficiency review, we review all the evidence, but do so in a neutral light and
determine whether the evidence supporting the verdict is so weak or is so outweighed by the great
weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly
unjust. Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); Roberts v. State, 220 S.W.3d
521, 524 (Tex. Crim. App. 2007); Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006);
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996).

 A pickup truck appeared at the rural Rusk County home of Seth and Sandra Russell around
8:00 to 8:30 p.m. In the truck were Lackey, Kasey, and a third person who was driving. Kasey
knocked on the Russells' door and announced that she was looking for her sister Kara, long a friend
of the Russells' son, Seth Jr. Kasey was agitated at this time, being described as hysterical, and
claimed that Kara and Seth Jr. were on the Russells' land at a pasture party and that Kara had asked
Kasey to meet her there.

 Sandra testified that Kasey got more and more hysterical as she talked; eventually, Sandra
awakened her husband Seth to take Kasey out to the pasture and demonstrate to her that no one was
out there. The Russells led the Lackeys down a country road, and took them into the pasture. No
one was found out there, partying or otherwise.

 Sandra's testimony indicates, however, that this did not defuse Kasey. By that point, Kasey
was furious, cursing and yelling at Sandra and Seth. Kasey went "on and on about, you know, just
because we owned all this land, we thought we were better than everybody else; you know, she was
going to whip my ass; you know, I didn't know who I was messing with." Although Kasey remained
in the middle of the pickup seat, Lackey, who was riding on the passenger side, stepped out of his
(right side) door, as Seth stepped out of his own truck. As described by Sandra's testimony, Lackey,
"screaming and yelling," got a piece of pipe out of the pickup's bed. Seth picked up a ball-peen
hammer or hatchet--the evidence is conflicting--and the two men headed toward each other. 
During the midst of this, Sandra called the county sheriff's department and asked for assistance. A
violent confrontation was narrowly averted.

 Thereafter, these things happened: Seth told the Lackeys to get off his property, Sandra
talked her husband back into their truck, Lackey got back in the passenger side of his truck, and that
vehicle started in a direction leading off the Russell property. In Sandra's narrative, the truck stopped
often on that short trip. The Russells quite prudently opted to stay well behind the Lackey vehicle,
and eventually the Lackeys turned back onto a county road.

 Sandra testified that she then saw a man get out of the passenger side of the truck on that
county road and make what she described as throwing motions. The Lackeys then drove away but
stopped again at the Russells' house, where the man on the passenger side went around the truck and
made what Sandra described as backhanded throwing motions like he was tossing corn to chickens. 
After that, the man got back into the truck, and it finally disappeared. Sandra identified Lackey as
the man who had exited the truck (and tossed whatever had been tossed onto the road). She noted
that the truck's driver was a good deal larger than Lackey and that there were huge spotlights at a
nearby saltwater pump station that lit up the intersection. 

 When the Russells pulled their truck out onto the road, it ran over a large number of roofing
nails which perforated its tires. Police arrived shortly thereafter, and also drove over the nails,
flattening three or four tires on each of three squad cars. In addition, the Russells' mailbox, which
was located approximately where Lackey stopped the second time, was smashed flat. 

 Seth's testimony was essentially the same as his wife's. 

 Lackey contends that this evidence is insufficient to show that he was responsible for the
scattering of the nails because there is evidence of another actor: Kara, the "missing" sister, testified
that a cousin from out of town had bragged to her that he was driving the pickup and had thrown out
the nails. Despite multiple pretrial efforts by officers to obtain a name, the cousin was identified for
the first time at trial as Jason Bentle, a cousin who seldom visited and lived in Dallas. Kara also
testified that they were at a beer-drinking pasture party at the Russells' pasture, but, after waiting an
hour and a half or so for her sister to appear, had left before the sister arrived. Kara also testified that
it was around 11:30 or 12:00 when she called her sister and that, when they left, they left a bonfire
burning. 

 On cross-examining Kara, the State pointed out that, although she said she had called her
sister at near midnight, and then that she left an hour and a half after that, police had come to the
location by nine or ten o'clock that night, and that everything was over by one in the morning. The
State also pointed out that this story first saw daylight at her brother-in-law's trial. Lackey then
elicited testimony that she had told him about it two weeks previously. 

 An aunt, Kathy Odom, testified similarly about Bentle, and stated that she had not been
questioned by any investigators and had not volunteered any information to police.

 Kasey's grandmother, Shirley Odom, testified that Odom had told Deputy Charles Helton the
name of Bentle when the officer came to her home shortly after the incident. She also testified that
Bentle had not admitted that he actually threw the roofing nails. 

 Crystal Runnels, an assistant manager at the local Goodyear dealership, testified about the
value of damaged tires as used material. She testified that she would pay roughly between twenty
and thirty-five dollars per tire for used tires with about half the tread left. She also testified that they
sold tires to the local police department and that they disposed of the ones removed from police
cruisers by reselling them if possible, or just disposing of them if not. She also noted that she
typically paid nothing for used police tires; they were simply removed when new ones were installed. 
She also testified that tires with multiple punctures--like the fifteen to twenty punctures shown on
several photographs of tires damaged during this incident--could not safely be repaired, especially
on a police cruiser that might run at high speeds. 

 Kasey also testified. She testified that, after getting off work at Sonic, she went to the
Russells' home around 9:30 p.m. after receiving a call from Kara. (2) Kasey testified that Sandra was
rude to her; that she did not understand why Sandra suddenly had developed a problem, because the
Russells usually partied with the kids; and that both Russells smelled like liquor and could not stand
up straight. Her version of the story was that Lackey emerged from the truck because the Russells
were screaming at Kasey. Kasey testified that they accused her of bringing alcohol to the pasture
parties. She stated that the Lackeys had driven by the pasture first and saw no party, but had gone
to question the Russells anyway. According to Kasey's version of events, the Russells insisted that
they accompany the Lackeys to the pasture to see that no party was taking place.

 Kasey testified that Seth got violent, swinging a hammer (with an axe blade) around and
close to her husband (who was still in the pickup). She testified that they did not stop on the way
out of the pasture, but only at the stop sign. She noted that the driver, Bentle, got out and, she
thought, urinated. Then they drove off, meeting her sister on the same road a few minutes later. (3) 
Kasey testified that she knew nothing about any roofing nails until Bentle told her about it later that
evening. Kasey testified that it was at least three months before an officer, Helton, came by their
house to question them about that night, but that she did not tell Helton about Bentle's "admission"
about the nails. She also testified that, because the officer cursed at her, she did not volunteer
Bentle's "admission." 

 Helton testified from his notes that his visit to the house was five days after the events in
question. He testified that Kasey did not tell him about Bentle's "admission" about the nails, and did
not identify him in any respect. 

 Kathy Odom also testified that Bentle bragged about putting the nails out. 

 Lackey testified in his own defense, with a story matching his wife's in most respects. The
points of differentiation are in the length of time that elapsed before officers came to their house to
talk to them--he testified it was only a few days, rather than three months--and the officer's
behavior while there--the officer, although sounding like a "broken record," was quite cordial and
pleasant.

 Sandra was recalled and testified that she was certainly not drunk that night. In fact, she
testified that she was allergic to alcohol and had not had a drink since she was in her early twenties. 

 Deputy Russell was also recalled and testified that he was dispatched to the Russell property
at 9:00 p.m., arriving about fifteen to twenty minutes later, that neither of the Russells had any smell
of alcohol on them and that they showed no symptoms of intoxication. 

 Seth was also recalled, and testified that he had drunk something alcoholic that afternoon,
but was in bed asleep when the Lackeys arrived because he had to go to work around four or five in
the morning. He testified that he never condoned children drinking in his pasture, that he had once
broken up such a party and poured out all their beer, that he was worried about liability, and that he
had picked up a ball-peen hammer, not a hatchet, during the confrontation. 

 There is conflicting evidence about the sequence and nature of events that occurred on that
night. There is evidence from which a jury could find that Lackey was the individual responsible
for scattering nails all over the roadbed, and there is evidence to the contrary. In such a situation,
the jury's determination controls. As the evidence is not so unbelievable as to require a different
result, we find that the evidence is both legally and factually sufficient to support the jury's
assessment of guilt.

(2) Legally and Factually Sufficient Evidence Supports a Finding that Damages from the
Offense Exceeded $1,500.00

 Lackey argues that the evidence is insufficient to prove the monetary cost of the damages. 
We disagree. There is evidence of the amount paid by Russell to ultimately replace the tires
damaged by the nails. There is testimony by police officers about the cost to the department to
replace the tires on their patrol cars--four at a cost of $149.00 each, and six at $137.00
each--testimony supporting a finding that the department was damaged about $1,418.00.

 Seth testified that he ultimately had to replace all six tires on his truck because of the damage
caused by the nails, at a cost of $680.00 to $700.00.

 Lackey argues specifically that the State, given that Seth had repaired and used some of his
tires for seven months, could clearly have done likewise with the squad car tires. However, there
was evidence of forty to fifty punctures per tire on some of them, and also testimony pointing out
that tires with such repairs were not reliable for high-speed or emergency driving. Further, even Seth
pointed out that it became necessary for him to replace his own tires because they failed under stress.

 Lackey also complains that the State failed to prove the residuary or used value of the tires;
thus, there is no real evidence of their actual net value. There was evidence, however, that, when
the tires were replaced, the tire dealership gave them no credit for those tires. In contravention of
this, Lackey points to testimony by a Goodyear store assistant manager that she often gave between
twenty and thirty-five dollars for used tires, depending on the state of the tire. As previously stated,
she also testified that tires with such damage would not be repairable and that she did not provide
such trade-in valuations for police tires. We also note, however, that, even had the jurors disregarded
the officer's testimony about their lack of trade-in value, and even if the jury had assumed that they
were indeed all worth the maximum $35.00 per tire, the loss of value of the property nevertheless
exceeds the $1,500.00 minimum of the charged offense. 

 The evidence is legally and factually sufficient to support the verdict that the damages from
the offense exceeded $1,500.00.

(3) There Has Been No Showing that Any Failure to Preserve Evidence Harmed Lackey

 Lackey also argues briefly, and without resort to relevant authority, that the State engaged
in spoliation by disposing of the tires before they could be examined by a representative of Lackey
to determine if they were truly destroyed or were repairable. Although this argument is linked to the
damage argument, it does not appear that this argument was ever brought to the trial court's attention. 
Thus, it has not been preserved for our review. See Tex. R. App. P. 33.1.

(4) There Has Been No Showing that the State Failed to Adequately Investigate the Offense

 Lackey also argues briefly that the State did not adequately investigate the offense: if the
State had done its job properly, it would be prosecuting "Jacob Bentle," rather than Lackey (and
eventually his wife, who has evidently also been indicted for this crime).

 It is the duty of every peace officer to: (1) use all lawful means to preserve the peace within
his or her jurisdiction; (2) prevent or suppress crime; (3) execute all lawful process issued to him
or her by any magistrate or court; (4) give notice to some magistrate of all offenses committed within
his or her jurisdiction, where he or she has good reason to believe there has been a violation of the
penal law; and (5) arrest offenders without warrant in every case where he or she is authorized by
law. Tex. Code Crim. Proc. Ann. art. 2.13 (Vernon 2005); Dominguez v. State, 924 S.W.2d 950,
953 (Tex. App.--El Paso 1996, no pet.). (4)

 We also recognize the duty imposed by the Legislature as follows: "the primary duty of all
prosecuting attorneys . . . not to convict, but to see that justice is done." Tex. Code Crim. Proc.
Ann. art. 2.01 (Vernon 2005). This does not, however, translate into an affirmative duty on either
prosecutors or investigators to eliminate all possible miscreants when their investigation identifies
a possibly guilty party.

 Lackey supports this argument by stating that the investigator, Helton, closed his
investigation after, while attempting to interview Kasey, he lost his temper and cursed at her. There
is evidence from Kasey to that effect, and also testimony from Helton that Kasey had lost her temper
and cursed at him, with her husband, Jacob, attempting to calm her down. Thus, even the testimony
itself is in conflict, and it is apparent that an investigation was conducted, which ultimately resulted
in a conviction supported by sufficient evidence. Under such facts, we do not agree with Lackey's
position that any right to an adequate investigation was violated. (5)

 We affirm the judgment.



 Josh R. Morriss, III 

 Chief Justice


Date Submitted: April 7, 2009

Date Decided: April 17, 2009


Do Not Publish
1. Lackey's punishment was assessed by the trial court at two years' confinement, which was
probated for a term of five years, and restitution was ordered in the amount of $2,107.00.
2. She testified that they rode with Jason because his truck worked, and theirs had not run for
two years. 
3. Kasey testified that his action was unsurprising, as he drank beer one after another all day
long, one forty-ounce bottle or can after another. She then backed up and testified that he was not
drinking while they were going to check on her sister.
4. Similarly, a police officer must exercise discretion in determining how to investigate, and
to what extent to investigate before seeking a warrant. See City of Hempstead v. Kmiec, 902 S.W.2d
118, 121 (Tex. App.--Houston [1st Dist.] 1995, no pet.). 
5. We also recognize that counsel has directed us to no authority or cases that involve a
situation such as this, and we have found nothing directly on point.



EM>Pennzoil Company v. Southwest Bank of San Angelo, 775 S.W.2d 458 (Tex.
App.-Austin 1989, no writ), a special deposit was not found to exist even though the plaintiffs
accompanied their deposit to the defendant bank with a message from their bank among other things
stating "REF; BONUS CONSIDERATION ON 12 LEASES." Id. at 459. The court held this
writing failed to set forth by clear direction its intent that the funds were only to be disbursed as
bonus payments on certain leases. In the present case, no special instructions were presented to
Riverway.

 Bills argues in this case a special deposit was created, thereby establishing a bailor/bailee
relationship. He relies on the following:

 1. the signatures of Bloxsom and Bills were both required to withdraw funds, and funds
could not be withdrawn on facsimile authorization;

 2. prior custom and dealing of the parties;

 3. the deposit by Bills stated the payee was "Fort Apache Southwest Starks Escrow
Account Ethridge Turnkey Account."

 Riverway relies on the following to show the account is not a special deposit:

 1. the deposit account agreement was the only document evidencing the account; no
special instructions were contained in the account agreement;

 2. testimony of employee Deborah Rodriguez, who opened the account and testified
Bills never came to Riverway and she never spoke with him; she was not told the account was being
created to hold funds in trust, and she did not agree to do so;

 3. testimony of Bloxsom admitting he did not tell Riverway what the account was for; 
 4. Bills' testimony admitting he did not go to Riverway and did not speak to anyone
there until the funds had been withdrawn;

 5. testimony of MacIntyre, bank officer, who did not know there was anything particular
about the account; and that a trust or escrow account would require the approval of a bank officer
and a separate agreement between Riverway and the parties. 

 It is clear there were no other agreements or instructions given to Riverway other than that
found on the deposit agreement. We have found no authority, and none has been cited, holding that
an account requiring two signatures to release funds creates a special deposit.

 Bills alleges that evidence of a previous course of conduct or dealing assists in finding a
special deposit or bailment agreement. Trade usage or method of dealing evidence is admissible to
explain, supplement, or qualify an agreement, but it may not be used to contradict an express term;
it is also admissible to establish the meaning of an ambiguous contract. Transcon. Gas Pipeline
Corp. v. Texaco, Inc., 35 S.W.3d 658, 670 (Tex. App.-Houston [1st Dist.] 2000, pet. denied).

 The Bilbo account was the same type of account as the account presently at issue. Both
accounts served as funds for a turnkey agreement. Money was placed in the account, and Bills' and
Bloxsom's signatures were required to withdraw any funds. With the Bilbo account, the funds were
disbursed, according to the terms of the deposit agreement, only when both Bills and Bloxsom
signed. The terms of the Bilbo account were fully complied with, and the money was released
properly. However, the prior account does not further explain the nature of this account.

 There is also summary judgment evidence of a check deposited into this account signed by
E. Carter Bills drawn on the Starks Funding Account, payable to the order of Fort Apache S.W.
Starks Escrow Account for $231,562.50. This check was deposited into Riverway to the "Ethridge"
account, number 62075. This deposit was made two days after the account was established and
could not alter its nature. Further, a bank is not required to investigate memoranda on a check
describing the payment intended. See Frost Nat'l Bank v. Nicholas & Barrera, 534 S.W.2d 927,
933-34 (Tex. Civ. App.-Tyler 1976, writ ref'd n.r.e.).

 This Court finds that no genuine issue of material fact exists as to whether this was a special
deposit. It does not meet the test established by the Texas Supreme Court in Citizens National Bank
of Dallas v. Hill. Since there is no express special agreement, a special deposit can only be created
by implication. To do so, "the writing should set forth by clear direction what the bank is required
to do." 505 S.W.2d at 248. The point of error is overruled.

B. Third-Party Beneficiary

 Carson Energy and Bills argue that, even if they are not in direct privity with Riverway Bank
on the contract, they are third-party beneficiaries. Generally, only parties to a contract have the right
to complain of its breach. Temple Eastex, Inc. v. Old Orchard Creek Partners, Ltd., 848 S.W.2d
724, 730 (Tex. App.-Dallas 1992, writ denied). An exception exists when one who is not a party
to the contract shows that the contract was actually made for his or her benefit and that the
contracting parties intended that he or she benefit by it. Id. In such a case, that person becomes a
third-party beneficiary entitled to bring an action on the contract. Id. 

 There is a presumption against, not in favor of, third-party beneficiary agreements. MCI
Telecomm. Corp. v. Tex. Util. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999); Young Ref. Corp. v.
Pennzoil Co., 46 S.W.3d 380 (Tex. App.-Houston [1st Dist.] 2001, pet. denied). Absent clear
indication in the contract that the parties intended to confer a direct benefit to the third party, the
third party may not maintain an action as a third-party beneficiary. MCI Telecomm. Corp., 995
S.W.2d at 651. A third party may recover on a contract made by other parties, only if the parties
intended to secure some benefit to that third party, and only if the parties entered into the contract
directly for the third party's benefit. Id.

 To qualify as one for whose benefit the contract was made, the third party must show he or
she is either a donee or creditor beneficiary of, and not one who is benefitted only incidentally by the
performance of, the contract. Id. One is a donee beneficiary if the performance promised will, when
rendered, come to him or her as a pure donation. Id. If, on the other hand, that performance will
come to him or her in satisfaction of a legal duty owed to him or her by the promisee, he or she is
a creditor beneficiary. Id. The duty to creditor beneficiaries may be an "indebtedness, contractual
obligation or other legally enforceable commitment" owed to the third party. Id. In determining
whether a third party can enforce a contract, the intention of the contracting parties is controlling. 
Id. The intention to contract or confer a direct benefit to a third party must be clearly and fully
spelled out or enforcement by the third party must be denied. Id. Consequently, a presumption
exists that parties contracted for themselves unless it "clearly appears" they intended a third party
to benefit from the contract. Id. 

 In determining whether a third party can enforce a contract, the intention of the contracting
parties is controlling. Id. A court will not create a third-party beneficiary contract by implication. 
Id. The intention to contract or confer a direct benefit to a third party must be clearly and fully
spelled out, or enforcement by the third party must be denied. Id. 

 In the case at bar, the contract or agreement has previously been described. It is a deposit
agreement wherein the depositor is Fort Apache Energy, Inc. Ethridge Turnkey Account. The only
reference to E. Carter Bills is that he is a signatory on the account. It further shows on the account
that the owner is a "corporation." Bills did not execute a signature in any representative capacity for
Carson Energy. There is no language in the deposit agreement indicating the account was being
opened for the benefit of Carson Energy or Bills. It does not specifically grant Bills a direct benefit. 
The agreement simply does not support a claim of third-party beneficiary for Bills or Carson Energy.

C. Negligence

 Appellants' next contention is Riverway was negligent in its handling of the account by
allowing Bloxsom to transfer funds without Bills' signature. Riverway has responded that Bills'
claim only arises by reason of the deposit agreement and is based on contract principles. It further
urges that all losses were economic and not recognizable in tort. Bills argues Riverway did not
present a motion for summary judgment regarding negligence. However, the pleading of Bills was
that the bank was negligent in releasing funds without proper authority. Bills did not plead any other
grounds of negligence. Riverway's motion for a summary judgment alleged it did not breach such
duty to Bills. 

 It is possible to have both contractual and tort remedies against the same party, if the injuries
so permit. Goose Creek Consol. Indep. Sch. Dist. v. Jarrar's Plumbing, Inc., 74 S.W.3d 486, 494
(Tex. App.-Texarkana 2002, pet. denied). 

 As a prerequisite to asserting a claim of negligence, there must be a violation of a duty
imposed by law independent of any contract. Southwestern Bell Tel. Co. v. DeLanney, 809 S.W.2d
493, 494 (Tex. 1991); Ortega v. City Nat'l Bank, No. 13-00-00064-CV, 2003 Tex. App. LEXIS 677,
at *27 (Tex. App.-Corpus Christi Jan. 23, 2003, no pet. h.). Where the only duty between parties
arises from a contract, a breach of this duty will ordinarily sound only in contract, not in tort. 
DeLanney, 809 S.W.2d at 494. 

 In Goose Creek, this Court held that entering a contract does not shield a party from regular
tort liability. The court found that a plumbing contractor owed a duty to all persons to use reasonable
care not to injure persons or property in the performance of the contract. The injury in that case
involved the invasion of sewage and sewer gas into the school buildings and the failure to use
reasonable care in installing the plumbing system. The court found that to be an independent tort
duty. See Goose Creek, 74 S.W.3d at 495. The court held that Goose Creek (as it was not a party
to the contract) could not raise a claim based solely on the duties imposed under the contract, but
could enforce the independent tort duty. See id. at 494.

 In this case, Carson Energy and Bills' cause of action for negligence alleges "the bank had
a duty to plaintiffs as well as to Fort Apache to safeguard the funds entrusted to them, and to not
release such funds except in accordance with the deposit agreement." Carson Energy and Bills have
asserted no independent duty owed to them other than that as established by the deposit agreement. 
The deposit contract alone is determinative of whether Riverway improperly released funds. As a
prerequisite to asserting a claim of negligence, there must be a violation of a duty imposed by law
independent of any contract. Delanney, 809 S.W.2d at 494; Ortega, 2003 Tex. App. LEXIS 677,
at *27. Having found no tort duty independent of the contract, the trial court correctly granted the
motion for summary judgment as to the negligence claim.

IV. Conclusion

 We affirm the judgment.



 Jack Carter

 Justice


Date Submitted: February 21, 2003

Date Decided: March 6, 2003