Opinion issued April 23, 2026



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00608-CV

————————————

**M-I L.L.C., Appellant**

**v.**

**Texas International Terminals, Ltd., Appellee**

---

**On Appeal from 122nd District Court**
**Galveston County, Texas**
**Cause No. 21-CV-0311**

---

## MEMORANDUM OPINION

This appeal arises from a settlement agreement dispute between Texas International Terminals, Ltd. ("TXIT") and M-I L.L.C. ("M-I"). The trial court granted summary judgment against M-I and concluded that M-I breached the parties' settlement agreement. The trial court declared that certain language be included in

the previously executed settlement agreement and ordered that the amended agreement be executed within seven days of its order.

In three issues, M-I contends that the trial court erred by (1) requiring M-I to enter into a new settlement agreement including terms not previously agreed to by the parties; (2) adding to and deleting terms from the parties' prior agreements; and (3) alternatively, miscalculating the amount of the annual payment owed by M-I.

We reverse and remand.

## Background

M-I entered into a Materials Handling Agreement ("MHA") with Galveston Bulk Terminals L.P., and Galveston Bulk Terminals assigned its rights and benefits under the MHA to TXIT. Under the MHA, TXIT provided stevedoring and transportation services to M-I, including receiving and unloading M-I's products from vessels, transporting, and stockpiling that product. In return, M-I agreed to pay for and use TXIT's services for a minimum annual tonnage at a rate that was initially fixed but could be adjusted by the parties after the initial three years.

Following years of litigation, the parties entered into a settlement agreement that included the following provisions:

1. Payment of the Lease on a monthly basis in accordance with its terms but all possessory rights will be terminated effective October 30, 2023. [TXIT] and the Intervenors SULTEX, Ltd. ("SULTEX") and 5700 PIB, LLC ("PIB") will acknowledge that land and improvements will be returned as is, where is;

2.      A stipulation that the balance due under the Lease is $1,671,296;

3.      Payment by [M-I] of the regular, annual payments under the MHA for 2024 and 2025, and a ½ payment in 2026, and a single payment within 45 days in the amount of $5,000,000 for the damages to the bulkhead, fendering expenses, attorney's fees, interest, storage at PIB and all other sums claimed in the above-captioned Lawsuit;

4.      Mutual, global releases of all claims asserted in the Lawsuit or not, along with a dismissal with prejudice. The settlement documents will be prepared in a form mutually acceptable to counsel for the M-I, TXIT, SULTEX, and PIB (the "settling parties").

TXIT moved for summary judgment seeking a declaration that (1) the "regular, annual payments under the MHA for 2024 and 2025, and a 1/2 payment for 2026" under the settlement agreement's third provision included price adjustments tied to the consumer price index ("CPI") based on the parties' course of dealing; and (2) M-I remove its equipment from the TXIT's premises on TXIT's request. TXIT presented an affidavit by its president as evidence of the parties' course of dealing under the MHA and to support its position that M-I must remove its equipment according to the parties' sub-lease agreement, despite the settlement agreement's "as is" provision. M-I objected to the affidavit and sought to enforce the settlement agreement, contending (1) the "regular, annual payments under the MHA" did not include the CPI price adjustment because the MHA did not provide for it; and (2) the settlement agreement gave M-I the right to return the premises to TXIT in its then-existing condition, which M-I had done.

The trial court granted TXIT's summary judgment motion and concluded M-I breached the settlement agreement. The trial court ordered that the following language be included in the settlement agreement and that M-I execute the agreement within seven days:

1.  M-I shall make the required payments of "regular, annual payments" under the MHA as follows:

    - On May 1, 2024, the amount of $2,540,000 or as otherwise CPI adjusted in accordance with the methodology established by the prior course of dealing prior to the Effective Date;

    - On May 1, 2025, the amount of $2,540,000 or as otherwise CPI adjusted in accordance with the methodology established by the prior course of dealing prior to the Effective Date;

    - On May 1, 2026, the amount of $1,270,000 or as otherwise CPI adjusted in accordance with the methodology established by the prior course of dealing prior to the Effective Date.

2.  The M-I equipment that appears in the image below shall be removed, if [TXIT] requests the removal, and such equipment shall be removed within 180 days of termination of the Sub Lease Agreement. [TXIT] may only request the removal of the following items and none other:

4

| | |
|---|---|
| 1 | Desks |
| 2 | Refrigerator |
| 3 | Computer Monitors |
| 4 | Conference Room Table |
| 5 | Filing Cabinets |
| 6 | 54" Mill Base |
| 7 | 67' Crusher Conveyor |
| 8 | 66" Mill Skid |
| 9 | Air Dryer |
| 10 | Gas Tank |
| 11 | Diesel Tank |
| 12 | Remaining Electrical Switch Gear |
| 13 | Air Compressor |
| 14 | Shaker Screens – (2) |
| 15 | Conveyor Magnets – (2) |
| 16 | 24" Screw Conveyor |
| 17 | Overhead Crane |
| 18 | Truck Scale #10 |
| 19 | Truck Scale #20 |
| 20 | 40' x 18' Diameter Gravity Silos – (6) |
| 21 | 70' Avery Weigh Tronix Truck Scale Model #1310 |
| 22 | 24" x 70' Screw Conveyors with Drives & Platforms – (4) |
| 23 | Feed Hopper Mill 1 – 25' x 12' Diameter |
| 24 | Feed Hopper 2 – 25' x 12' Diameter |
| 25 | Mill Dust Collector |
| 26 | Mill Cyclone |
| 27 | 40' x 18' Diameter Welded Gravity Silos and Platforms – (2) |
| 28 | Overhead Manifold (Approximately 1,000' to Dock Area) |
| 29 | 36" x 120' Galvanized Conveyors with Drive – (2) |
| 30 | 120' Orthman Bucket Elevators and Platforms – (2) |
| 31 | Bagging System Dust Collection and Reclaim System |
| 32 | Cyclone for 66" Raymond Mill |

The trial court further ordered that its declaratory ruling was enforceable by contempt if the agreement was not timely completed and signed.

M-I moved to modify the judgment and for new trial and requested rulings on its objections to summary judgment evidence and its motion to enforce the settlement agreement. The trial court overruled M-I's objections and denied all M-I's motions.

**Standard of Review**

We review the trial court's summary judgment under a de novo standard of review. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In doing so, we take as true all evidence favorable to the nonmovant and make every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.*

5

The construction of an unambiguous contract is a question of law, which we review de novo. *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 449 (Tex. 2015). Additionally, whether a contract is ambiguous is itself a question of law. *Id.*

**Interpretation of the Settlement Agreement**

Because the trial court's interpretation of the settlement agreement informs its enforcement of the same, we address M-I's interpretation issue first. M-I contends that the trial court rewrote the parties' settlement agreement instead of interpreting it and improperly relied on extrinsic evidence. TXIT responds that the trial court properly relied on TXIT's extrinsic evidence of the parties' course of dealing in interpreting and enforcing the "regular, annual payments under the MHA" of the settlement agreement. TXIT further responds that M-I's complaint regarding the trial court's order to remove certain equipment was moot, but in any event, the order complied with the land lease and common practice.

"Under Texas law, we interpret settlement agreements like other contracts." *Sandt v. Energy Maint. Servs. Grp. I, LLC*, 534 S.W.3d 626, 642 (Tex. App.— Houston [1st Dist.] 2017, pet. denied). "In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the document." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). "When a contract is worded such that it has a certain and definite legal meaning, it is unambiguous." *Transcont'l Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 665 (Tex. App.—

6

Houston [1st Dist.] 2000, pet. denied). "Only if a contract is subject to more than one reasonable interpretation can it be ambiguous." *Id.* The parties' conflicting interpretations do not make an otherwise straightforward contract ambiguous. *Id.* "When the meaning of the contract is plain and unambiguous, a party's construction is immaterial." *Id.* at 666.

We interpret unambiguous contracts by their express terms and enforce unambiguous contracts as written. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008); *Lyons v. Ortego*, No. 01-17-00092-CV, 2018 WL 4014218, at *2 (Tex. App.—Houston [1st Dist.] Aug. 23, 2018, pet. denied). But we may examine the contract as a whole and the circumstances surrounding the contract's formulation. *Texaco*, 35 S.W.3d at 665.

We agree with the parties and the trial court that the express language of the settlement agreement is unambiguous. When a contract is unambiguous, a court may not consider extrinsic evidence, including evidence of the parties' course of dealing. *Haden,* 266 S.W.3d at 451; *Frost Nat'l Bank*, 165 S.W.3d at 313 n.3.

Although surrounding circumstances may objectively inform a contract's text, a party cannot use extrinsic evidence to give the contract a meaning different from the one its language clearly supports; add to, contradict, or alter the contract's terms; make the language say what it clearly does not say; or show that the parties probably

7

meant, or could have meant, something other than what their contract stated. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 769 (Tex. 2018).

In the settlement agreement, the parties agreed that M-I would pay the "regular, annual payments under the MHA for 2024 and 2025, and a 1/2 payment in 2026 . . . ." The only reasonable interpretation of "regular, annual payments under the MHA" is that the M-I's regular, annual payments comply with the terms of the MHA. Because the MHA unambiguously explains that the rate can be adjusted annually upon mutual written agreement, the parties must have a mutual written agreement to modify the rate. The MHA also states that if the parties fail to agree, the prevailing rate from the previous year carries forward to the next year until an agreement is reached.

TXIT claims that "regular, annual payments under the MHA" also incorporates the parties' course of dealing. TXIT relies on its president's affidavit explaining that the parties had a regular course of dealing in which they used the CPI as the adjustment factor to annually calculate the rate for the MHA payment and proof of such a CPI adjustment in the 2023 MHA payment. Although M-I expressly refused CPI's proposed language, the trial court used CPI's proposed language and ordered M-I to pay for 2024 and 2025: $2,540,000 each year or as otherwise CPI adjusted according to the parties' prior course of dealing, and for 2026: $1,270,000 or as otherwise CPI adjusted according to the parties' prior course of dealing.

8

The trial court impermissibly relied on TXIT's extrinsic, course of dealing evidence to construe the unambiguous language in the parties' settlement agreement and add terms that contradicted its plain language. *See Maxey v. Maxey*, 617 S.W.3d 207, 225 (Tex. App.—Houston [1st Dist.] 2020, no pet.). Courts do not have the authority to rewrite contracts to insert provisions that the parties could have included but did not, and that are not essential to the construction of the contract's language. *Id.*

Because the settlement agreement's express terms are clear and support M-I's interpretation, we do not consider TXIT's course of dealing evidence. *See URI, Inc.*, 543 S.W.3d at 769; *Frost Nat'l Bank*, 165 S.W.3d at 313 n.3. If there is no mutual written agreement, as M-I asserts, then the 2024 MHA payment would include the prevailing rate from the previous year, and so on. Absent a written agreement to modify the rate, the payments due under the MHA for 2024 and 2025 are each $2,314,000, and the payment for 2026 is $1,157,000.

The parties also agreed in the settlement agreement that "land and improvements will be returned as is, where is." The only reasonable interpretation of "as is, where is" is that M-I, as tenant, may leave the property in its current condition without removing anything. It effectively shifts the risk concerning the condition of the property at its existing site and any resulting loss. *See Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995).

9

TXIT contends that M-I's equipment subject to removal according to the trial court's order is neither "land" nor "improvements" and describes M-I's equipment as both "fixtures" and "personal property." Although TXIT relies on the sub-lease, its express terms confirm M-I was never responsible for removing its fixtures or personal property. Under the sub-lease, only alterations and improvements must be removed if requested by TXIT, but M-I "*can* remove any personal property, fixtures or temporary alterations to the land." Accordingly, whether M-I's pieces of equipment are improvements, fixtures, or personal property, the parties' written contracts allow M-I to leave them on the property. Thus, by requiring M-I to remove 32 pieces of equipment from the property on TXIT's request, the trial court disregarded "the fundamental principle that courts cannot rewrite the parties' contract or add to or subtract from its language." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 242 (Tex. 2016).

TXIT argues that M-I's appeal of the trial court's removal obligation is moot because M-I agreed to transfer $400,000 to TXIT to be fully discharged and released from its removal obligations under the trial court's order. However, M-I represented to TXIT that such settlement and payment of $400,000 "will not constitute a waiver of any [p]arty's rights to move to modify, correct, or challenge the [trial court's] order, move for new trial, or appeal any other provision in the [order]." "The Texas rule is not, and never has been, simply that any payment toward satisfying a

judgment, including a voluntary one, moots the controversy and waives the right to appeal that judgment." *Miga v. Jensen*, 96 S.W.3d 207, 211 (Tex. 2002). Parties who clearly communicate that they reserve the right to appeal preserve their appellate rights. *Id.* at 211–12. Because M-I expressly reserved its right to appeal, its payment of $400,000 to TXIT did not render M-I's appeal of the equipment removal obligation moot.

The trial court ignored the settlement agreement's pertinent language when altering the terms of the settlement agreement to include CPI adjustments in the payments and to require M-I to move 32 pieces of equipment upon TXIT's request. We decline to impose CPI adjustments in the MHA payments and equipment removal requirements when the terms of the settlement agreement did not provide for them. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 482 (Tex. 2019) (declining to read qualifier into consent-to-assign provision when agreement's terms clearly give party unrestricted right to withhold consent).

We sustain M-I's second issue.

**Enforcement of the Settlement Agreement**

In its first issue, M-I contends that the trial court erred by ordering M-I to enter a settlement agreement in which the trial court dictated the precise terms to be included. TXIT responds that the trial court properly enforced the agreement of the parties.

11

A written settlement agreement between the parties disposing of their dispute is enforceable in the same manner as any other written contract, and the court has the discretion to incorporate the terms of the agreement in its final decree disposing of the case. TEX. CIV. PRAC. & REM. CODE § 154.071. But a final judgment based on the parties' settlement agreement must be in strict or literal compliance with that agreement. *Chisholm v. Chisholm*, 209 S.W.3d 96, 98 (Tex. 2006); *Vickrey v. Am. Youth Camps, Inc.*, 532 S.W.2d 292, 292 (Tex.1976) (per curiam). "A final judgment does not strictly comply with a settlement agreement when the trial court's judgment adds terms, significantly alters the original terms, or undermines the intent of the parties." *Cobb v. Morace*, No. 01-07-01036-CV, 2009 WL 2231909, at *4 (Tex. App.—Houston [1st Dist.] July 23, 2009, no pet.) (mem. op.). A trial court may modify terms of a settlement agreement in its judgment only if the modification does not add terms, significantly alter the original terms, or undermine the parties' intent. *Id.*

Here, the trial court ordered specific terms to be included in the settlement agreement and for M-I to timely agree to such terms or otherwise be held in contempt. Assuming without deciding specific performance was a proper remedy for breach of the settlement agreement,[1] the trial court overstepped its authority by

---

[1] The party seeking specific performance must show that it has complied with its obligations under the contract, but, here, the record does not show that TXIT has

12

adding and significantly altering terms to the parties' settlement agreement. These terms imposed new obligations on M-I to which it had not agreed, including a provision requiring M-I to pay a rate that included CPI adjustments and a provision requiring M-I to remove various equipment at TXIT's request. The trial court erred by ordering M-I to enter into the settlement agreement with new terms.

We sustain M-I's first issue.[2]

## Conclusion

We conclude that the trial court erred by failing to interpret and enforce the parties' settlement agreement as written. We reverse the trial court's judgment and remand this cause for further proceedings consistent with this opinion.

Clint Morgan
Justice

Panel consists of Justices Gunn, Morgan, and Dokupil.

---

complied with its obligations under the settlement agreement. *See Maxey*, 617 S.W.3d at 226.

[2] Because of our disposition of M-I's first two issues, we need not reach M-I's third issue. *See* TEX. R. APP. P. 47.1.

13